*No. 22-1877*

---

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

---

EDWARDS LIFESCIENCES CORPORATION,
EDWARDS LIFESCIENCES LLC,

*Plaintiffs - Appellants,*

v.

MERIL LIFE SCIENCES PVT. LTD., AND MERIL, INC.,

*Defendants - Appellees.*

---

Appeal from the United States District Court for the Northern District of California
Case No. 4:19-cv-06593-HSG, Judge Haywood S. Gilliam, Jr.

---

**DEFENDANTS – APPELLEES' RESPONSIVE BRIEF**

---

Melanie L. Mayer
Jonathan T. McMichael
FENWICK & WEST LLP
1191 Second Avenue, 10th Floor
Seattle, WA 98101
(206) 389-4510

J. David Hadden
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
(650) 335-7684

*Attorneys for Defendants - Appellees*

December 16, 2022

## PATENT CLAIMS AT ISSUE

There are no patent claims at issue in this appeal.

# CERTIFICATE OF INTEREST

Counsel for Defendants-Appellees Meril Life Sciences Private Limited, and Meril, Inc. certifies the following pursuant to Federal Circuit Rule 47.4:

1. The full name of every party or amicus represented by me is:

    Meril Life Sciences Private Limited and Meril, Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    As indicated in item 1.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    Meril Life Sciences Private Limited is a subsidiary of Micro Life Sciences Private Limited, which is a subsidiary of Bilakhia Holdings Private Limited. Meril, Inc. is a wholly owned subsidiary of Meril Life Sciences Private Limited.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this case (and who have not or will not enter an appearance in this case) are:

| Law Firm | Partners and Associates |
| --- | --- |
| Fenwick & West LLP | Jeffrey A. Ware<br>Michelle E. Irwin<br>Chieh Tung (no longer with Fenwick & West LLP)<br>Sapna S. Mehta (no longer with Fenwick & West LLP) |

5. Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case.

    None.

6. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).

None/Not applicable.

Dated: December 16, 2022

Respectfully submitted,

By: */s/ J. David Hadden*
J. David Hadden

FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Telephone: (650) 335-7684

*Attorneys for Defendants - Appellees*
MERIL LIFE SCIENCES PVT. LTD., AND MERIL, INC.

## TABLE OF CONTENTS

STATEMENT OF RELATED CASES ............................................................. viii

INTRODUCTION ............................................................................................ 1

STATEMENT OF THE ISSUES........................................................................ 3

STATEMENT OF THE CASE............................................................................ 3

I. MERIL AND THE MYVAL TRANSCATHETER HEART VALVE ..... 3

II. MERIL'S PREPARATION FOR FDA APPROVAL OF MYVAL.......... 5

III. MERIL RECRUITS CLINICAL TRIAL INVESTIGATORS AT THE 2019 TCT CONFERENCE.......................................................................... 9

IV. EDWARDS FILES A COMPLAINT FOLLOWING THE TCT CONFERENCE ........................................................................................ 14

V. THE DISTRICT COURT'S SUMMARY JUDGMENT ORDER .......... 16

SUMMARY OF THE ARGUMENT ............................................................... 20

ARGUMENT ................................................................................................... 22

I. STANDARD OF REVIEW ...................................................................... 22

II. THE SECTION 271(e)(1) SAFE HARBOR DEFENSE ......................... 24

III. THE DISTRICT COURT DID NOT DISREGARD EVIDENCE OR FAIL TO VIEW THE EVIDENCE IN THE LIGHT MOST FAVORABLE TO EDWARDS ............................................................. 28

IV. THE DISTRICT COURT'S ORDER DOES NOT RELY ENTIRELY ON THE NILAY LAD DECLARATION AND THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT NILAY LAD HAD PERSONAL KNOWLEDGE OF THE FACTS IN HIS DECLARATION ........................................................................................ 41

V. THE DISTRICT COURT DID NOT RELY ON MERIL'S ALLEGED SUBJECTIVE INTENT FOR THE IMPORTATION ............................. 46

CONCLUSION AND RELIEF SOUGHT ........................................................ 51

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Abtox, Inc. v. Exitron Corp.*,
122 F.3d 1019 (Fed. Cir. 1997) ........................................................ *passim*

*Amgen Inc. v. Hospira, Inc.*,
944 F.3d 1327 (Fed. Cir. 2019) ........................................................ *passim*

*Amgen Inc. v. Int'l Trade Comm'n*,
565 F.3d 846 (Fed. Cir. 2009) ........................................................ 38

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................ 23

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
435 F.3d 1356 (Fed. Cir. 2006) ........................................................ 24, 42

*Barthelemy v. Air Lines Pilots Ass'n*,
897 F.2d 999 (9th Cir. 1990) ........................................................ 44

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........................................................ 23

*Chartex Int'l PLC v. M.D. Pers. Prods. Corp.*,
No. 92-1556, 1993 WL 306169 (Fed. Cir. Aug. 12, 1993) ........................ *passim*

*Classen Immunotherapies, Inc. v. Biogen IDEC*,
659 F.3d 1057 (Fed. Cir. 2011) ........................................................ 38

*Eli Lilly & Co. v. Medtronic, Inc.*,
496 U.S. 661 (1990) ........................................................ 24, 25

*Finjan LLC v. ESET, LLC*,
51 F.4th 1377 (Fed. Cir. 2022) ........................................................ 22

*Harman v. Apfel*,
211 F.3d 1172 (9th Cir. 2000) ........................................................ 43

*Hopkins v. Andaya*,
958 F.2d 881 (9th Cir. 1992) ........................................................ 44, 45

*In re Google Tech. Holdings LLC*,
980 F.3d 858 (Fed. Cir. 2020) ........................................................ 42

*Intermedics, Inc. v. Ventritex Co.*,
No. 92-1076, 1993 WL 87405 (Fed. Cir. Feb. 22, 1993) ........................ *passim*

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
751 F.3d 1327 (Fed. Cir. 2014) ........................................................ 24, 43

*LVRC Holdings LLC v. Brekka*,
581 F.3d 1127 (9th Cir. 2009) ........................................................ 23

# TABLE OF AUTHORITIES
## (CONTINUED)

**CASES** **PAGE(S)**

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) .... 23

*Med. Diagnostic Labs., L.L.C. v. Protagonist Therapeutics, Inc.*,
298 F. Supp. 3d 1241 (N.D. Cal. 2018) .... 25

*Medtronic, Inc. v. Daig Corp.*,
789 F.2d 903 (Fed. Cir. 1986) .... 35

*Merck KGaA v. Integra Lifesciences I, Ltd.*,
545 U.S. 193 (2005) .... 25, 26, 40, 50

*Momenta Pharms., Inc. v. Teva Pharms. USA Inc.*,
809 F.3d 610 (Fed. Cir. 2015) .... 26, 47, 51

*Navarrete v. Kinkisharyo Int'l, LLC*,
845 F. App'x 515 (9th Cir. 2021) .... 43, 44

*Neville v. Found. Constructors, Inc.*,
972 F.3d 1350 (Fed. Cir. 2020) .... 22

*Padgett v. Wright*,
587 F.3d 983 (9th Cir. 2009) .... 42

*Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*,
315 F.3d 1335 (Fed. Cir. 2003) .... 35

*Proveris Sci. Corp. v. Innovasystems, Inc.*,
536 F.3d 1256 (Fed. Cir. 2008) .... 3, 18, 27

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
659 F.3d 1142 (Fed. Cir. 2011) .... 42

*Sea-Land Serv., Inc. v. Lozen Int'l, LLC*,
285 F.3d 808 (9th Cir. 2002) .... 43

*Telectronics Pacing Systems, Inc. v. Ventritex, Inc.*,
982 F.2d 1520 (Fed. Cir. 1992) .... 3, 18, 27

*Villiarimo v. Aloha Island Air, Inc.*,
281 F.3d 1054 (9th Cir. 2002) .... 44

*W. Pac. Fisheries, Inc. v. SS President Grant*,
730 F.2d 1280 (9th Cir. 1984) .... 35

**OTHER AUTHORITIES**

21 C.F.R. § 56.103(a) .... 9, 36

21 C.F.R. § 812.20 .... 5

## TABLE OF AUTHORITIES
(CONTINUED)

**OTHER AUTHORITIES** **PAGE(S)**

21 C.F.R. § 812.42 ....................................................................................5, 6

21 U.S.C. § 360c ..........................................................................................5

35 U.S.C. § 271(a) ....................................................................................19, 27

35 U.S.C. § 271(e)(1).................................................................................*passim*

Fed. R. Civ. P. 56(a)......................................................................................23

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5(a), no other appeal in or from this case has previously been before this Court or any other appellate court. Pursuant to Federal Circuit Rule 47.5(b), counsel is unaware of any other pending cases that will directly affect, or will be directly affected by, the Court's decision in this appeal.

## INTRODUCTION

This case is about two artificial heart valves that Meril kept in a bag in a storage room at a medical conference in San Francisco for a few days, that were never displayed or shown to anyone, and that were then transported out of the United States. Appx296; Appx372-374. Edwards hired a team of attorneys to monitor Meril's activities at the medical conference, looking for anything that could be used to file a lawsuit and impede Meril's efforts to introduce its Myval-branded heart valve in the United States. Appx640.

Although Meril never showed the Myval device to anyone at the conference, for a short period of time, Meril's LinkedIn page stated that Meril had "exhibited" Myval at its booth—a reference to PowerPoint presentations that Meril gave to potential clinical trial investigators about Myval. Appx900; Appx374. When Meril realized that the post could suggest that Meril displayed Myval (which it did not), Meril removed the post. Appx374. However, Edwards seized on this post as an opportunity to file a complaint for patent infringement against Meril on October 14, 2019, two weeks after the conference. Appx27; Appx226-227.

The district court correctly determined that there was no genuine issue of material fact that Meril's importation of the two heart valves to the conference was reasonably related to recruiting clinical trial investigators for FDA approval and therefore this importation fell squarely within the safe harbor of 35 U.S.C.

§ 271(e)(1). As the district court found, it is undisputed that, as of the time of the conference, Meril had taken significant steps towards obtaining FDA approval for Myval, including: (1) preparing a formal clinical trial synopsis for its Landmark Trial for Myval (Appx1203-1216); (2) preparing a draft presubmission to seek FDA input on its clinical trial protocol (Appx1145); (3) communicating with the FDA regarding Meril's proposed clinical study and presubmission (Appx376-380; Appx382-386); and (4) hiring an FDA consultant to help with the FDA presubmission (Appx371; Appx1146-1147). Appx9. It is undisputed that the Transcatheter Cardiovascular Therapeutics (TCT) conference is attended by leading cardiovascular clinicians and is often used to recruit clinical trial investigators. Appx371-373; Appx517. It is undisputed that Meril met with potential clinical trial investigators at the conference and also held an additional investigator meeting at a nearby restaurant during the conference. Appx961; Appx774-783; Appx1154; Appx1218; Appx1220-1223. The documentary evidence confirms that Meril brought the two heart valves to the conference to offer "hands-on and [virtual reality] VR sessions," in which the devices are used with a simulator to educate potential clinical trial investigators about how to implant a Myval heart valve in a patient. Appx398; Appx892; Appx1167-1168. It is undisputed that, when the simulator malfunctioned, the two Myval devices were left in a bag in a storage room at the conference. Appx373-374.

If Meril really imported the devices for some purpose other than use with the simulator, as Edwards argues, Meril would have gone ahead and used them at the conference. It is undisputed that this did not happen. It is also undisputed that there were no sales or offers to sell Myval at the conference. Appx1429-1430. Every court that has addressed non-sale demonstrations of medical devices at medical conferences, where the device sponsor is preparing to apply for FDA approval, has found that such activities are covered by the safe harbor. The undisputed facts and documentary evidence here fit squarely within the *Telectronics*, *Proveris*, *Intermedics*, and *Chartex* cases, and the safe harbor applies. The district court's summary judgment order should be affirmed.

## STATEMENT OF THE ISSUES

1. Whether the district court correctly granted summary judgment of non-infringement under 35 U.S.C. § 271(e)(1), where undisputed evidence showed that Meril's importation of two demonstration samples of the Myval device to a medical conference was reasonably related to recruiting investigators for a clinical trial to support FDA approval and where it is undisputed that Meril made no sales or offers to sell Myval at the medical conference.

## STATEMENT OF THE CASE

### I. MERIL AND THE MYVAL TRANSCATHETER HEART VALVE

Meril Life Sciences is an India-based, global medical device company that was founded in 2007 with the express aim of improving quality of life through

innovative and advanced healthcare solutions. Appx370. Meril, Inc. is a wholly owned subsidiary of Meril Life Sciences. *Id.* One of Meril's leading innovations is its Myval-branded transcatheter heart valve, which is intended to treat severe symptomatic native aortic valve stenosis, a condition where the aortic valve narrows and restricts normal blood flow. *Id.* Myval was designed to be implanted in a patient's heart using a minimally invasive transcatheter aortic valve replacement (TAVR) procedure in which a catheter carrying the heart valve is inserted into a blood vessel in the patient's thigh or groin and then navigated up to the patient's heart where the valve is deployed.[1] Before TAVR, the only treatment option was open heart surgery.

In 2015, although TAVR was widely available in more developed countries such as Germany and the United States, only a few hundred TAVR procedures were performed in India, despite India having a population of over one billion people. Appx310. Meril developed Myval to improve on existing valves and to make this life-saving treatment available to patients with limited access or no other options. Appx300; Appx310-313.

Meril began conducting clinical trials for Myval in India in June 2017, and received approval to market Myval in India on October 31, 2018. Appx370. In

[1] *See* https://www.nhlbi.nih.gov/health/tavr.

April 2019, Myval was granted the CE marking, which allowed Meril to market Myval in the European Economic Area. *Id.*

## II. MERIL'S PREPARATION FOR FDA APPROVAL OF MYVAL

Meril also pursued regulatory approval for Myval in the United States. In the United States, Myval is considered a "Class III" medical device subject to strict regulatory standards. Appx296; Appx370; *see* 21 U.S.C. § 360c(a)(1)(C) (classifying a Class III device as "for . . . use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health"). Meril may not lawfully market or sell Myval in the United States without first receiving mandatory premarket approval from the FDA. 21 U.S.C. § 360c; 21 C.F.R. § 812.20; 21 C.F.R. § 812.42; Appx296; Appx370. The premarket approval processes for Class III devices are the most stringent. Appx371. To receive premarket approval, Meril must first apply for and obtain an investigational device exemption ("IDE") from the FDA, identify clinical investigators to implant the device in human subjects, collect data from those subjects that shows the safety and efficacy of the device, and then submit the data to the FDA. Appx296; Appx370.

To obtain regulatory approval in India and Europe, Meril relied on data from a 100-patient clinical trial conducted in India. However, Meril understood that, for a Class III device like Myval, the FDA would require a larger clinical trial and

would also require that some clinical trial patients be in the United States. Appx370-371; Appx390-395; Appx1148-1149; Appx1188-1189. Meril also knew that, to conduct clinical trials in the United States, it would first have to apply for and obtain an IDE from the FDA. Appx296; Appx370; Appx1026 ("U.S. clinical study should be initiated only after IDE").

Meril's plans to seek FDA approval for Myval thus spanned years leading up to the accused importation of two demonstration samples to the TCT conference in September 2019. Appx1138; Appx1163. In January 2017, Meril shipped six non-commercial samples of Myval to the University of Washington ("UW") to conduct preclinical investigations on cadavers to determine whether the Myval transcatheter heart valve could be safely implanted in live human subjects in future clinical studies. Appx295. Members of the UW team, led by the director at the Center for Cardiovascular Innovation at UW, successfully implanted the non-commercial Myval transcatheter heart valve in cadavers, which enabled Meril to plan its clinical studies with human subjects. *Id.*

Around the same time, Meril began planning a preclinical animal study for Myval with the CRF Skirball Center for Innovation in New York (the "Skirball" study). Appx858. The Skirball study was to investigate the feasibility of implanting Myval into live human subjects, and whether Meril could do so safely in clinical studies. *Id.*; Appx1170. In December 2016, Meril sent three non-

commercial samples of the Myval transcatheter heart valve to Skirball. Appx858. The Skirball study occurred on January 27, 2017 and the results were documented in a written report describing Myval's performance. Appx1323-1326. The district court ruled that Meril's importation of the Myval devices for these preclinical studies falls under the safe harbor of 35 U.S.C. § 271(e)(1) and Edwards does not appeal this portion of the district court's order. Appx10-13.

Although Meril's plans to pursue FDA approval of the Myval device began much earlier, Meril prepared a formal synopsis for a clinical trial to support FDA approval in July 2019. Appx9; Appx1203-1216. Meril's clinical trial to support FDA approval was known as the Landmark Trial. *Id.*; *see also* Appx1139-1140; Appx1164. The formal synopsis proposed a global, randomized trial to compare the safety and performance of Meril's Myval device with two other heart valves that had already received FDA approval in the United States, Edwards' Sapien 3 and Medtronic's Evolut. Appx1203. In August 2019, Meril finalized a date for an investigator meeting it would hold during the TCT conference to recruit clinical trial investigators for the Myval Landmark Trial. Appx719.

In August 2019, Meril also instructed its Senior Manager for Regulatory Affairs to begin drafting a presubmission to the FDA. Appx1145; Appx1011 (collecting data for Myval presubmission to FDA in August 2019). The FDA presubmission process allows applicants to get FDA input before filing an

application for an IDE. Appx370-371; Appx510-511. Meril corresponded with the FDA in August and early September 2019 about the Landmark Trial, including how many patients the FDA would require be located in the U.S. Appx371; Appx376-380; Appx382-386. The FDA directed Meril to a published guidance document that states premarket approval of medical devices can be supported by clinical trials outside of the U.S. (OUS), inside the U.S., or both. Appx377-378. Since U.S. trials are more expensive than OUS trials and are subject to FDA pre-approval, Meril planned to have as many patients at OUS sites as possible and Meril's documents reflect this. Appx1186-1189; Appx1194-1195; Appx1198-1200; Appx947-951; Appx954-958.

On September 3, 2019, Meril engaged an FDA consultant, CardioMed, to help with the FDA presubmission process. Appx388; Appx371; Appx1146-1147. Before Meril attended the 2019 TCT conference, CardioMed confirmed that the FDA would allow OUS sites for Myval, but would also require some patients to be in the U.S. Appx1029-1030; Appx1148-1149; Appx390-395. Leading up to TCT, Meril continued to correspond with the FDA about regulatory approval for Myval. Appx382-386. Meril was also actively identifying and enlisting clinical trial investigators to support FDA approval, including both foreign and U.S. clinicians. *See* Appx782; Appx719-727; Appx547 (Edwards agreeing that "In the months before TCT . . . Sanjeev Bhatt was traveling around Europe recruiting clinical

investigators for the Landmark Trial.”). At the time of TCT, Meril had only announced OUS clinical trial sites for Myval because it had not yet received an IDE from the FDA, which is required to initiate clinical studies in the U.S. 21 C.F.R. § 56.103(a); Appx1186-1187; Appx1026.

## III. MERIL RECRUITS CLINICAL TRIAL INVESTIGATORS AT THE 2019 TCT CONFERENCE

Meril sought out potential clinical trial investigators at the 2019 TCT conference in San Francisco—an annual scientific symposium hosted by the Cardiovascular Research Foundation (“CRF”) featuring the latest in interventional cardiovascular medicine, and attended by leading researchers and clinicians. Appx296; Appx371-372; Appx519. The TCT conference is an ideal forum for medical device manufacturers like Meril to seek out clinicians as potential investigators for the premarket approval process. Appx371-373; Appx296; Appx1154; Appx517. The TCT web page specifically points out that the TCT conference is often used to recruit clinical trial investigators. Appx517 (“Industry plays a critical role at TCT, from extending the educational experience into the Exhibit Hall and . . . running investigator meetings”). As noted above, although Meril had conducted a foreign clinical trial for the Myval system before, Meril understood that the FDA would require additional clinical studies and investigators—including requiring that some portion of the clinical studies be in the U.S. with investigators to support those studies. Appx370-371; Appx390-395;

Appx1148-1149; Appx1188-1189. In advance of the TCT conference, Meril provided CRF a digital flyer containing information about Meril's booth and its agenda at the conference. Appx372; Appx397-400. The CRF distributed this flyer to individuals who had subscribed to receive email updates about the TCT conference. Appx372.

Before TCT, Meril also sent an email to conference attendees to let them know that Meril would offer "hands-on and VR sessions on Meril's TAVR [Transcatheter Aortic Valve Replacement] system." *Id.*; Appx890-893; Appx1112. These virtual reality (VR) sessions refer to sessions with a simulator that allows clinicians to mimic implanting a Myval artificial heart valve in a patient using a TAVR procedure. Appx1167-1168; Appx1176. The simulator includes an echocardiogram and can mimic potential complications of a TAVR procedure, such as a patient going into arrhythmia. *Id.* The simulator is a complicated instrument used to educate and train cardiologists to perform TAVR procedures. *Id.* It is not a marketing ploy. *Id.*

Meril brought the Myval samples to TCT to be used with the simulator, thus providing clinicians the "hands-on and VR sessions" to learn how the heart valve works and is implanted. Appx1110; Appx1167-1169. The simulator and the Myval device cannot show the implantation process by themselves; both are

required for the clinician to experience the VR implantation demonstration and understand the process. Appx1110.

Meril also contacted individual clinicians in advance of TCT, inviting them to an investigator meeting during the conference to discuss the Landmark Trial and to identify prospective clinical investigators. Appx571; Appx774-783; Appx961.

Nilay Lad, a Meril employee, traveled to San Francisco on September 24, 2019 to attend the TCT conference. Appx372. He hand-carried with him two non-commercial Myval transcatheter heart valves (THVs) on his flight into San Francisco International Airport. *Id.* The Myval samples were contained in a bag, and accompanied by a written declaration making clear that the devices would only be used for demonstration with the simulator and "not for any sales purpose":

> This is to inform you that the demo samples carried by Mr. Nilay Lad is for the demonstration purpose only.
>
> It is consist [sic] of Demo samples of Medical devices. They have no commercial value & hence it is not used for any sales purpose.
>
> The demo samples are NON-STERILE. NOT FOR HUMAN USE. NOT FOR SALE. NOT APPROVED FOR SALE IN UNITED STATES. FOR DEMO PURPOSE ONLY AT TCT 2019, SAN FRANCISCO.

Appx402; Appx372.

Meril had a booth at the TCT conference from September 26 to September 28, and provided information on Myval, in the form of visual displays and presentations, to potential clinical investigators. Appx372-373; Appx404-421;

Appx423-443. These presentations provided information on the components of the Myval system, the placement of Myval in a patient's heart, and how Myval could be used to treat patients with aortic stenosis. *Id*. Meril made clear to conference attendees, including through posted signs, that Myval was not yet approved by the FDA and that it was not available for sale. *Id*. (stating that "Myval THV System is not approved for sale in United States"). At the TCT conference, Meril also discussed the details of the Myval system with potential clinical trial investigators from the United States and other countries, including Dr. Ramesh Daggubati, the associate chief of Cardiology at NYU Winthrop Hospital. Appx373; Appx1218; Appx1220-1223.

In addition to meeting with and providing information to potential trial investigators at the TCT conference, it is undisputed that Meril held a separate investigator meeting during TCT to identify and enlist clinical trial investigators. Appx1141; Appx1154; Brief at 14. This investigator meeting was held at a nearby restaurant. Appx1154. Meril again provided presentations on Myval at this investigator meeting. Appx1141. Because the simulator is extremely large, and takes up an entire tabletop, Meril had always planned to use the simulator at the TCT conference and not take it to the restaurant. Appx1109. This is clear from Meril's communications prior to TCT conference, which state that clinicians

wishing to participate in "hands-on and VR sessions" with Myval should visit Meril's booth at the TCT conference. Appx398; Appx892.

However, because of technical difficulties with the simulator, Meril did not show the physical Myval devices at the conference. Appx373-374; *see also* Appx1110 (Mr. Lad testifying that the "[s]imulator system stands to show how the Myval System works so it gives them hands-on experience. And that was the role of simulator system. If that was not there, then there was no point of showing them the physical samples. That can be done through presentations as well."). Instead, the two Myval samples remained in a bag in a storage room at the TCT conference. Appx374. It is undisputed that Meril did not offer for sale or sell Myval at the TCT conference. Appx1429-1430 (Edwards' counsel admitting that there is no evidence of any sales or offers to sell Myval during the TCT conference); Appx373; Appx1177-1178; Appx1107-1108. On September 28, Mr. Lad gave the Myval samples to another Meril employee, Sanjeev Bhatt, to take to Europe on September 30. Appx374; Appx296. The two accused Myval samples that Meril maintained in a bag in a storage room at TCT are the basis for Edwards' patent infringement lawsuit.

After TCT, Meril followed up with the clinical investigators it had met with at TCT and the TCT investigator meeting and continued to educate them about the Myval system and to seek their input on the Landmark Trial. Appx1218;

Appx1220-1223. Meril also worked with CardioMed to finalize Meril's FDA presubmission. CardioMed recommended a study protocol with 50% of subjects in the U.S., but because the cost of U.S. trials is higher, Meril wanted to see if the FDA might allow for a lower percentage. Appx1194-1195; Appx1198-1200. Meril submitted a presubmission to the FDA on December 4, 2019 proposing that Meril conduct clinical trials both in the U.S. and outside the U.S., with about 30% of patients enrolled at U.S. clinical sites. Appx445-495 (*see, e.g.*, Appx459). On February 13, 2020, the FDA responded to Meril's presubmission, advising that Meril would need to enroll at least 50% of human test subjects at U.S. clinical sites. Appx500-502. Meril therefore provided a supplemental presubmission in May 2020, revising the study so that half of the patients would be in the U.S. Appx1225-1241.

## IV. EDWARDS FILES A COMPLAINT FOLLOWING THE TCT CONFERENCE

Edwards introduced the Sapien transcatheter heart valve in 2007.[2] The large majority of Edwards' Sapien revenue is from sales in the United States, where Edwards charges a premium price.[3] Edwards' aggressive litigation campaign against Meril has been aimed at preventing Meril from entering the U.S.

---

[2] https://www.sec.gov/Archives/edgar/data/1099800/000104746908001956/a2183020z10-k.htm at 32 (Edwards' Form 10-K noting that Edwards received approval to sell Sapien in Europe in 2007).

[3] https://www.sec.gov/Archives/edgar/data/1099800/000109980021000007/ew-20201231.htm at 87.

market. Edwards hired a team of attorneys to attend the 2019 TCT conference with the goal of collecting evidence that Edwards could use to file suit against Meril. Appx640. Although Meril never showed the Myval device to anyone at the TCT conference, for a short period of time, Meril's LinkedIn page stated that Meril had "exhibited" Myval at its booth. Appx900; Appx374. This was a reference to PowerPoint presentations that Meril gave to potential clinical trial investigators about Myval, one of which is shown in the LinkedIn post. Appx900. When Meril realized that the post could be read to suggest that Meril displayed the physical Myval samples at the TCT conference, Meril removed the post. Appx374. However, Edwards used the post as a basis for filing a complaint for patent infringement against Meril, which it filed just two weeks after the conference, on October 14, 2019. Appx27; *see also* Appx226-227, Appx242-248 (Edwards' First Amended Complaint alleging infringement as a result of Meril's booth at the TCT conference).

Meril moved to dismiss Edwards' patent infringement claims in the original complaint on November 27, 2019. Appx29. The district court denied Meril's motion, explaining that—at the pleading stage—the district court was required to accept all allegations in Edwards' complaint as true. Appx212-213. However, the district court allowed Meril to file an early summary judgment motion on the safe harbor issue. Appx34; Appx36. After filing its motion, Meril agreed to, and the

district court permitted, extensive discovery related to Meril's safe harbor defense, including months of written discovery, document requests, and depositions. *See* Appx1093-1094.

## V. THE DISTRICT COURT'S SUMMARY JUDGMENT ORDER

The district court granted Meril's motion for summary judgment on October 16, 2020. Appx1-20. In its order, the district court carefully considered the evidence and recited the undisputed facts. *Id.*; Appx1, n.1 (stating that the facts in the order are undisputed unless otherwise noted). The order explains that "[i]t is undisputed that as of the time of the TCT Conference, Meril had taken significant steps towards obtaining FDA approval for the Myval System." Appx9. These steps included "(1) preparing a formal clinical trial synopsis for its Landmark Trial, [Appx1203-1216]; (2) preparing a draft presubmission to seek FDA input on its clinical trial, [Appx1145]; (3) communicating with the FDA regarding Meril's proposed clinical study and its presubmission, [Appx376-380; Appx382-386]; and (4) hiring an FDA consultant to help with the FDA presubmission. [Appx371]; [Appx1146-1147]." Appx9. The district court specifically noted that Edwards "does not dispute these facts" (*id.*)—nor does Edwards dispute these facts in this appeal.

The district court found it undisputed that "Meril transported the medical device to the TCT Conference, which was attended by a large number of potential

clinical trial investigators." Appx10. In addition, the district court found it undisputed that Meril "sought out," and met with, "potential clinical researchers at the . . . []TCT Conference[]." Appx4. Edwards does not dispute these facts on appeal. And the district court found that "Meril did not sell or offer to sell its medical device at the medical conference." Appx10. The district court reached this conclusion not only based on evidence submitted by Meril, but also after Edwards' counsel conceded at the motion hearing that—following extensive discovery and Edwards' own surveillance of Meril's activities at the TCT conference—there was no evidence of sales or offers for sale of Myval at the TCT conference:

> THE COURT: Let me just make sure I'm clear. There's no dispute that there were no offers for sale or sales made at the conference; is that correct?
>
> MR. HANLE: Correct …
>
> THE COURT: Just—I—I fully understand your argument, but sounded like the answer to my question is yes. Right?
>
> MR. HANLE: Yes, We have no evidence that – that actual offers for sale was [sic] made.

Appx1429-1430.

The district court also carefully considered case law from the Supreme Court and this Court regarding the safe harbor. Citing Supreme Court precedent, the district court explained that Section 271(e)(1) "provides a wide berth for the use of patented [inventions] in activities related to the federal regulatory process" and that

"the safe harbor extends to 'all uses' reasonably related to the development of any information for FDA purposes." Appx6-7, Appx9 (citing *Merck KGaA v. Integra Lifesciences I, Ltd.*, 545 U.S. 193, 202 (2005)).

The district court discussed several cases from this Court specifically addressing application of the safe harbor in facts analogous to those here. Appx8-9; Appx10. In *Telectronics Pacing Systems, Inc. v. Ventritex, Inc.*, this Court affirmed summary judgment of non-infringement, holding that the defendant's demonstration of a defibrillator at seven medical conferences was covered by the safe harbor because "such demonstrations constitute an exempt use reasonably related to FDA approval" since "device sponsors are responsible for selecting qualified investigators and providing them with the necessary information to conduct clinical testing." 982 F.2d 1520, 1523 (Fed. Cir. 1992) (citing 21 C.F.R. § 812.40 ("Sponsors are responsible for selecting qualified investigators and providing them with the information they need to conduct the investigation properly.")). The district court also discussed *Proveris*, *Intermedics*, and *Chartex*, where this Court likewise affirmed the trial court's findings that non-sale demonstrations at medical conferences were covered by the safe harbor. *Proveris Sci. Corp. v. Innovasystems, Inc.*, 536 F.3d 1256, 1263 (Fed. Cir. 2008) ("demonstrating an implantable defibrillator at medical conferences was 'reasonably related' to FDA approval because it facilitated the selection of clinical

trial investigators"); *Intermedics, Inc. v. Ventritex Co.*, No. 92-1076, 1993 WL 87405, at *3 (Fed. Cir. Feb. 22, 1993) ("Assuming that these nonsale demonstrations at medical conferences constitute an infringing use, we have held they are an exempt use that is reasonably related to procuring FDA approval of the device."); *Chartex Int'l PLC v. M.D. Pers. Prods. Corp.*, No. 92-1556, 1993 WL 306169, at *1-4 (Fed. Cir. Aug. 12, 1993) (affirming summary judgment of non-infringement because exhibition of device at trade show was either a non-infringing act under 35 U.S.C. § 271(a) or exempt under the Section 271(e)(1) safe harbor).

The district court considered and rejected Edwards' argument that Meril only had a commercial purpose in transporting Myval samples to the TCT conference. Appx14. The district court discussed this Court's precedent establishing that Meril's purported purpose is not relevant to the safe harbor analysis. *Id*. For example, in *Abtox, Inc. v. Exitron Corp.*, this Court affirmed the grant of summary judgment of non-infringement, even though plaintiff—like Edwards here—asserted that the safe harbor did not apply because defendant's actual purpose was to "promote the [device]…to potential customers" and to offer it for sale. 122 F.3d 1019, 1027 (Fed. Cir. 1997). This Court rejected that argument, explaining that because the device testing (the allegedly infringing act)

was reasonably related to FDA approval, the safe harbor applied, regardless of defendant's intent, purpose, or motive, which are irrelevant. *Id*. at 1027-28, 1030.

After carefully analyzing the case law and the evidence, the district court found no genuine dispute of material fact that Meril's importation of two demonstration Myval samples—where it was undisputed that there were no sales or offers for sale—was reasonably related to recruiting clinical trial investigators for FDA approval and fell within the safe harbor of 35 U.S.C. § 271(e)(1).

## SUMMARY OF THE ARGUMENT

As explained above, the district court's order carefully identifies the undisputed facts and correctly applies the law. Edwards goes to great lengths to try to find fault with the district court's order, but none of Edwards' arguments has merit.

First, the district court did not ignore evidence or fail to view the evidence in the light most favorable to Edwards. As one example, Edwards argues the district court erred in finding that no sales or offers for sale of Myval occurred at the TCT conference. Brief at 36. However, at the summary judgment hearing, Edwards' counsel ***admitted*** that there is no evidence that there were any sales or offers to sell. Appx1429-1430. Edwards misunderstands the summary judgment standard—viewing the evidence in the light most favorable to Edwards does not mean that the district court was required to accept all of Edwards' arguments,

particularly where they are contrary to Edwards' own admissions. In addition, the fact that the district court's order does not specifically address each of Edwards' 45 exhibits does not mean that the district court ignored Edwards' evidence.

Second, the district court's analysis does not rely "entirely on the Declaration of Nilay Lad," as Edwards asserts. Edwards' argument is based on one sentence in the order that cites to the Lad Declaration, but that is obviously based on the court's analysis in the prior nine pages. Appx10 (first sentence). Those nine pages discuss the contemporaneous documentary evidence in great detail.

Nilay Lad also does not lack personal knowledge of the facts in his declaration. The district court overruled Edwards' objection to the Lad Declaration, finding that Mr. Lad ***personally*** transported the Myval devices to the TCT conference and ***personally*** consulted with counsel and Mr. Bhatt. Edwards never argues that the district court abused its discretion in overruling Edwards' evidentiary objection, which is the standard of review on appeal—it clearly did not.

Finally, the district court did not base its summary judgment order on Meril's subjective intent. Instead, the district court considered a long list of undisputed objective evidence, which inevitably leads to only one conclusion—Meril's importation of the two Myval devices was reasonably related to FDA

approval. That long list of evidence includes: (1) Meril had taken significant steps toward obtaining FDA approval for Myval prior to the TCT conference; (2) the TCT conference is attended by leading cardiovascular clinicians who are potential clinical trial investigators; (3) Meril met with potential clinical trial investigators for Myval at the TCT conference and also held an additional investigator meeting at a nearby restaurant; (4) before the conference, Meril informed potential clinical trial investigators that it would offer "hands-on and [virtual reality] VR sessions," in which the Myval devices would be used with a simulator to educate those investigators about how to implant a Myval heart valve in a patient; and (5) there were no sales or offers to sell Myval at the conference. Appx9; Appx371-373; Appx517; Appx961; Appx774-783; Appx1154; Appx1218; Appx1220-1223; Appx398; Appx892; Appx1167-1168; Appx1429-1430. The district court did not base its order on Meril's subjective intent.

## ARGUMENT

### I. STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment *de novo*. *Neville v. Found. Constructors, Inc.*, 972 F.3d 1350, 1355 (Fed. Cir. 2020). Summary judgment should be affirmed "when, drawing all justifiable inferences in the non-movant's favor, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Finjan LLC v. ESET, LLC*, 51

F.4th 1377, 1381 (Fed. Cir. 2022) (internal quotation marks omitted) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

This does not mean, however, that the Court must accept any assertion of the non-movant in opposing summary judgment. The Court accepts "justifiable inferences" and those "reasonably" drawn from the evidence in the record. *Anderson*, 477 U.S. at 252; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). The Court thus need not accept unreasonable inferences, factually unsupported assertions, or arguments that are contrary to the evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009). Nor must the Court accept a non-movant's legal arguments that are incorrect as a matter of law. *See* Fed. R. Civ. P. 56(a) (summary judgment appropriate in the absence of a "genuine dispute as to any material *fact*" (emphasis added)). In addition, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48. And, even when a non-movant does come forward with some evidence, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

As part of this appeal, Edwards challenges the district court's evidentiary ruling on Edwards' objection to the declaration of Nilay Lad. This Court reviews evidentiary rulings, including the admission of testimony through declarations, under the law of the regional circuit. *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1365 (Fed. Cir. 2006). The Ninth Circuit applies an abuse of discretion standard when reviewing a district court's evidentiary rulings. *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1339 (Fed. Cir. 2014) (citing *United States v. Wiggan,* 700 F.3d 1204, 1210 (9th Cir. 2012)).

## II. THE SECTION 271(e)(1) SAFE HARBOR DEFENSE

Congress enacted 35 U.S.C. § 271(e)(1) to address problems created by the legal requirements for premarket FDA approval of drugs and medical devices, particularly those involving patented inventions. *Eli Lilly & Co. v. Medtronic, Inc*., 496 U.S. 661, 669-70 (1990). One of these problems was the unintended effective extension of a patent term because third parties wishing to sell the patented product upon patent expiration would have to engage in a lengthy FDA approval process that created a *de facto* extension of the patent owner's monopoly while FDA approval was pending. *Id*. at 670. To address this distortion, Congress enacted the safe harbor of Section 271(e)(1), which provides:

> It shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a patented invention . . . solely for uses reasonably related to the development and submission of information under a Federal law which regulates

> the manufacture, use, or sale of drugs or veterinary biological products.

Section 271(e)(1) allows competitors, before the expiration of a patent, to engage in otherwise infringing activities if the use is "reasonably related" to obtaining regulatory approval. Section 271(e)(1) applies to medical devices such as the Myval system at issue here. *Eli Lilly,* 496 U.S. 661.

The Supreme Court has made clear that Section 271(e)(1) "provides a wide berth for the use of patented [inventions] in activities related to the federal regulatory process." *Merck KGaA*, 545 U.S. at 202; *see also Med. Diagnostic Labs., L.L.C. v. Protagonist Therapeutics, Inc.*, 298 F. Supp. 3d 1241, 1247 (N.D. Cal. 2018). In addition, "[Section] 271(e)(1)'s exemption from infringement extends to all uses of patented inventions that are reasonably related to the development and submission of *any* information under the FDCA [Federal Food, Drug, and Cosmetic Act]." *Merck KGaA*, 545 U.S. at 202. The safe harbor also applies regardless of the phase of research, and even if the information is never ultimately submitted to the FDA. *Id*. at 202, 205 ("There is simply no room in the statute for excluding certain information from the exemption on the basis of the phase of research in which it is developed or the particular submission in which it could be included."); *see also Abtox*, 122 F.3d at 1027 (finding the safe harbor applicable where, "[a]t the time of this litigation, [defendant] had neither filed an application for approval with the FDA nor otherwise marketed the device").

Whether a use is "reasonably related" to the development and submission of information to the FDA is an objective test. As the Supreme Court has explained, an activity is "reasonably related" to federal regulatory activities if an accused manufacturer has a reasonable basis for believing that a drug or device may work to achieve a particular effect, and uses the device in research that, if successful, would be appropriate to include in a submission to the FDA. *Merck KGaA*, 545 U.S. at 207.

Similarly, consistent with the language of the statute, the safe harbor inquiry focuses on acts or uses, and not on purposes, intent or motive. This Court has explained that "[t]he breadth of the exemption [under Section 271(e)(1)] extends even to activities the 'actual purpose' of which may be 'promot[ional]' rather than regulatory, at least where those activities are 'consistent with the collection of data necessary for filing an application with the [FDA].'" *Momenta Pharms., Inc. v. Teva Pharms. USA Inc.*, 809 F.3d 610, 619 (Fed. Cir. 2015) ("*Momenta I*") (citing *Abtox*, 122 F.3d at 1027). Therefore, an accused infringer's purported purpose or intent behind the use—even if commercially driven—is not relevant. *Id.*; *see also Amgen Inc. v. Hospira, Inc.*, 944 F.3d 1327, 1339 (Fed. Cir. 2019) ("*Amgen II*") (recognizing that "Hospira's additional underlying purposes do not matter as long as Hospira proved that the manufacture of any given batch of drug substance [the

accused activity] was reasonably related to developing information for FDA submission”).

Every court that has addressed non-sale demonstrations of medical devices at medical conferences, where the device sponsor is preparing to apply for FDA approval, has found that such activities are covered by the safe harbor. “[S]uch demonstrations constitute an exempt use reasonably related to FDA approval, because device sponsors are responsible for selecting qualified investigators and providing them with the necessary information to conduct clinical testing.” *Telectronics*, 982 F.2d at 1523; *see also Proveris*, 536 F.3d at 1263 (“demonstrating an implantable defibrillator at medical conference was ‘reasonably related’ to FDA approval because it facilitated the selection of clinical trial investigators”); *Intermedics*, 1993 WL 87405, at *3 (“Assuming that these nonsale demonstrations at medical conferences constitute an infringing use, we have held they are an exempt use that is reasonably related to procuring FDA approval of the device.”); *Chartex*, 1993 WL 306169, at *4 (affirming summary judgment of non-infringement because exhibition of device at trade show was either a non-infringing act under 35 U.S.C. § 271(a) or exempt under the Section 271(e)(1) safe harbor).

## III. THE DISTRICT COURT DID NOT DISREGARD EVIDENCE OR FAIL TO VIEW THE EVIDENCE IN THE LIGHT MOST FAVORABLE TO EDWARDS

The district court did not ignore evidence or fail to view the evidence in the light most favorable to Edwards.

**First, it is undisputed that Meril did not sell or offer to sell Myval at the TCT conference.** As explained above, at the hearing on Meril's motion for summary judgment, despite Edwards hiring counsel to monitor Meril's activities at the TCT conference, Edwards' counsel admitted (twice) that it had no evidence whatsoever of any sales or offers for sale:

> THE COURT: Let me just make sure I'm clear. There's no dispute that there were no offers for sale or sales made at the conference; is that correct?
>
> MR. HANLE: Correct …
>
> THE COURT: Just –I—I fully understand your argument, but sounded like the answer to my question is yes. Right?
>
> MR. HANLE: Yes, We have no evidence that – that actual offers for sale was [sic] made.

Appx1429-1430.

Without any mention of its admission, Edwards now argues that the district court erred in finding no sales or offers for sale based on what Edwards calls the "Instructions" document. Brief at 35-36. That document, which was drafted with input from Meril's counsel (Appx625-626), states: "Do not make any sales or offers for sale at the conference, or while in the United States for the US market.

You can make offer for other countries." Appx909. This document reflects input from Meril's legal counsel regarding what Meril could or could not do legally—Meril could not legally make sales or offers for sale for the U.S. because Myval was not approved by the FDA, but it could legally make offers for other countries. Significantly, this document—which only identifies what Meril ***could do*** legally—does not create any genuine issue of material fact regarding what Meril ***actually did***. As the district court correctly recognized, it is ***undisputed*** that Meril ***did not actually sell or offer to sell*** Myval at the TCT conference. Appx373; Appx1429-1430; Appx10. Thus, the district court's finding that "no sales or offers for sale" occurred at TCT is supported by the actual evidence and Edwards' own admissions and is certainly not "rebutted" by the Instructions document, as Edwards now argues.

**It does not matter that the simulator and Myval devices were brought to the TCT conference venue, and not to a restaurant where Meril held a separate investigator meeting, because it is undisputed that Meril met with potential clinical trial investigators at both the TCT conference and the restaurant.** Appx373; Appx1141; Appx1154. Edwards argues that Meril "never planned to use the imported Myval Devices at its only investigator meeting at TCT." Brief at 26. Edwards' suggestion that Meril only met with investigators at a single event is not correct. It is undisputed that Meril met with potential clinical

trial investigators throughout the TCT conference in addition to the separate investigator meeting at a nearby restaurant. Appx373; Appx1141; Appx1154. As explained above, because the simulator is a massive device that takes up an entire tabletop, Meril had always planned to use the simulator with the Myval devices at the TCT conference venue, where Meril had a large booth, and not at the restaurant. Appx373-374; Appx1109; Appx398; Appx892. The invitees to the separate investigator meeting were also attending the TCT conference, and the TCT booth was the more convenient and logical location to set up the simulator. The district court did not err by considering the actual undisputed evidence and not Edwards' incorrect characterizations of it.

**The safe harbor does not cease to apply because the simulator broke and Meril did not ultimately use the Myval devices.** Had the simulator functioned properly, and had Meril been able to use the Myval devices with the simulator to educate, identify, and enlist clinical investigators for its clinical trial, Edwards could not credibly claim that Meril's activities fell outside the safe harbor. The fact that the simulator malfunctioned does not change application of the safe harbor. Indeed, Edwards' argument that importation is no longer covered by the safe harbor because the simulator did not work and the devices were left in a bag makes no sense. Brief at 36. Edwards' position would make application of the safe harbor hinge on mishaps or probabilities of devices not working properly. In

addition, if the two Myval samples were imported for a purpose other than use with the simulator (as Edwards argues), then Meril would have gone ahead and used them and not have left them in the bag in the storage room when the simulator broke. But it is undisputed that they were left in the bag, and this is because they were only imported to use with the simulator to educate potential clinical trial investigators. Appx1110.

**The job titles of Meril employees who transported the Myval samples and simulator are not relevant.** Edwards makes much of the fact that the Meril employees who physically transported the Myval samples and the simulator into the U.S. do not personally engage in "clinical trials or clinical recruiting." Brief at 36, 43. Meril's Senior Vice President (Sanjeev Bhatt), who Edwards identifies as "Meril's principal recruiter for clinical trials" (Brief at 36), and Meril's Head of Clinical Research (Ashok Thakkar; Appx704), both attended the TCT conference to meet with potential clinical trial investigators, but they could not transport everything from India themselves. Appx296; Appx709; Appx898 (simulator packed in 3 boxes, including two "large" boxes). It is therefore not surprising that other Meril employees were tasked with transporting some items. In particular, given that Edwards admits to trying to seize Meril's devices and documents at other conferences (Brief at 15, 44), it is not surprising that Nilay Lad—who was managing Meril's response to Edwards' global litigation campaign (Appx612)—

was tasked with transporting the Myval devices. Similarly, the fact that employees from Meril's marketing group were asked to use their graphics design skills to create the initial drafts of the invite and flyer sent to the TCT attendees does not mean Meril only had a commercial purpose. Brief at 35, 42, 51. Sanjeev Bhatt, who was overseeing the recruitment of clinical trial investigators for Myval, was reviewing the drafts and deciding on the content. *See, e.g.*, Appx825; Appx907.

**That Meril sometimes recruited other clinical trial investigators without using a simulator does not mean importation was unrelated to FDA approval.** Sanjeev Bhatt, Meril's Senior Vice President, testified that, both before and after the TCT conference, he traveled by airplane to recruit clinical trial investigators for clinical trials to support Myval FDA approval. Appx782; Appx719-727. Given the enormous size of the simulator and that fact that it can break, it is not surprising that Mr. Bhatt preferred to use a PowerPoint presentation for those meetings and not transport a massive simulator on the airplane. Appx898. Edwards' argument that this somehow shows that Meril imported the devices to TCT for only commercial sales makes no sense. Brief at 37. As a matter of logic, even if Meril used only a PowerPoint to recruit some clinical trial investigators, this does not mean that the simulator/devices could not be used to recruit investigators as well; they are not mutually exclusive. Indeed, it is undisputed that Meril used both the simulator/devices and PowerPoint presentations to recruit clinical trial

investigators on other occasions. *E.g.*, Appx964 (Meril announcing attendance at the 2019 PCR London Valves Conference, including "interactive hands-on simulator sessions with Meril's latest innovation – Myval™ THV"); Appx693. Meril also attempted to use both at the TCT conference, but the simulator was not working. Appx373-374. The district court was not required to accept Edwards' illogical argument.

**Edwards' argument that "no documentary evidence connected the imported Myval Devices to 'recruiting clinical investigators'" is not correct.** Brief at 44. Edwards does not dispute that, before the TCT conference started, Meril invited TCT attendees—including potential clinical trial investigators—to "have hands-on and VR sessions" of the Myval transcatheter heart valve. Appx890-893 (email dated September 14); Appx746-748; Brief at 35. It is undisputed that the "hands-on and VR sessions" refer to virtual reality (VR) sessions with the simulator and that the simulator is used with the Myval devices. Appx373-374; Appx1110; Appx615-616. The simulator is a complicated, educational tool that teaches clinicians how to implant a Myval heart valve into a patient's heart. Appx1167-1168, Appx1176. It is not a sales prop. *Id.* It is also undisputed that Meril met with potential clinical trial investigators at the conference. In addition, this same invite has a link to the agenda for the Meril Lunch Symposium held at the TCT conference, at which Meril gave presentations

about Myval to potential clinical trial investigators. Appx747 ("View Symposium Agenda"); Appx373; Appx404-421; Appx423-443 (presentations to clinicians at TCT). All of these contemporaneous documents connect importation of the Myval devices to Meril's recruitment of clinical trial investigators.

In the face of this evidence, Edwards argues that Meril should have sent a single invite describing both the "hands-on and VR" sessions *and* the investigator meeting—*i.e.*, in the same invite as it did for the PCR Valves meeting—and that Meril's separate invites here demonstrate that Meril never planned to use the simulator/devices with potential clinical trial investigators. Brief at 10, 35, 44. The safe harbor does not require a single document to link the allegedly infringing activity to FDA approval. And, of course, the district court was not required to limit its analysis to a single document or accept Edwards' unsupported speculation. The district court reviewed all of the documentary evidence and correctly concluded that the safe harbor applies.

**That the district court's summary judgment order does not mention every document submitted by Edwards does not mean the district court overlooked evidence.** Edwards argues that it submitted "45 exhibits" that, it contends, create a genuine dispute of material fact and that the district court "never addressed the[se] documents." *Id.* at 23. But "[t]he fact that the district court did not in its opinion recite every piece of evidence does not mean that the evidence

was not considered." *Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*, 315 F.3d 1335, 1343 (Fed. Cir. 2003); *see also Medtronic, Inc. v. Daig Corp.*, 789 F.2d 903, 906 (Fed. Cir. 1986) ("We presume that a fact finder reviews all the evidence presented unless he explicitly expresses otherwise."); *W. Pac. Fisheries, Inc. v. SS President Grant*, 730 F.2d 1280, 1285 (9th Cir. 1984) ("We presume that the judge considers all of the evidence, and relies on so much of it as supports the finding and rejects what does not support the finding, unless the judge states otherwise."). Here, the district court made clear during oral argument that it had "read [the parties' briefing] carefully" and was "fully up to speed on the arguments" being made. Appx1404-1405. This is also apparent from the district court's detailed order. Appx1-20. Edwards makes no legally or factually credible argument that the district court overlooked evidence.

**Edwards' arguments about the Landmark Trial are contrary to FDA regulations and the undisputed evidence.** First, Edwards asserts that the Landmark Trial was "wholly unrelated to any FDA approval" because, at the time of the TCT conference, Meril had not announced "plans for domestic investigation sites" and the sites announced at that time were "exclusively outside the United States." Brief at 38. This argument is directly contrary to FDA regulations, which make clear that FDA approval can be supported by clinical trials within the U.S., outside the U.S. (OUS), or both. Appx1304 (FDA confirming that clinical

investigations to support FDA approval may be "conducted domestically or overseas"); Appx1306 ("rely[ing] solely on OUS clinical data as support for an IDE or device marketing application or submission . . . is permitted under the [FDA] regulations"); Appx377-378 (FDA informing Meril that clinical studies may be in the U.S., outside the U.S., or both). Indeed, in the case of Myval, Meril and the FDA specifically discussed the Landmark Trial, and the FDA informed Meril that half of the clinical trial patients could be outside the U.S., with the remainder in the U.S. Appx1050. Meril had not yet announced U.S. sites at the time of the TCT conference because it had not yet obtained an IDE from the FDA, which was required before Meril could start U.S. clinical trials. 21 C.F.R. § 56.103(a); Appx1186-1187; Appx1196-1197; Appx1026 ("U.S. clinical study should be initiated only after IDE"). At the time of the TCT conference, it was clear that at least some portion of patients in the clinical trial to support FDA approval could be located outside the U.S. and Meril was moving forward with those sites. Appx1304; Appx1306; Appx1026. Therefore, Edwards' argument that a clinical trial is "wholly unrelated to any FDA approval" if it includes clinical sites outside the U.S. is contrary to both the FDA's regulations and the documentary evidence in this case. As the district court correctly concluded after reviewing the evidence, "it is undisputed that FDA approval can be supported by clinical trials that include patients both within and outside the US. Therefore, even

if the Landmark Trial was an entirely 'OUS' study at the time of the TCT Conference, and even if Meril was only identifying investigators at the TCT Conference for this OUS trial, . . . the Landmark Trial was reasonably related to FDA approval." Appx9, n.3 (internal citations omitted).

Second, Edwards' argument that the Landmark Trial was unrelated to FDA approval because it was a "comparative study" that compares Myval to two heart valves that are already approved in the United States—Edwards' Sapien and the Medtronic Evolut—is not correct. Brief at 38. FDA regulations explain that a non-inferiority study comparing a device to an already-approved device may be ethically required, particularly where, as here, it would not be ethical to use a no-treatment control. Appx1252. In addition, the FDA told Meril that the Myval clinical trial should compare Myval to Sapien and Evolut. Appx501 ("FDA recommends that the randomization be carried out as 2:1:1 (Myval:Sapien:Evolut)"). Given that the FDA regulations and communications specifically told Meril to do a comparative clinical study for Myval, Edwards' argument that such a study is "wholly unrelated to any FDA approval" and "only for marketing purposes" is a fiction and the district court was not required to accept it.

Third, Edwards' argument that the Landmark Trial is a "post-approval" study is misleading at best. *E.g.*, Brief at 5, 8, 15. Edwards' "post-approval" label

appears to be based on the Landmark Trial happening "post" regulatory approval *in India and Europe*. However, the "post-approval" cases that Edwards cites address situations in which a party had already either obtained FDA approval for sales *in the U.S.* or at least submitted its clinical data to the FDA. *Classen Immunotherapies, Inc. v. Biogen IDEC*, 659 F.3d 1057, 1070 (Fed. Cir. 2011) (addressing applicability of safe harbor to routine reporting to FDA "long after marketing approval has been obtained"); *Amgen Inc. v. Int'l Trade Comm'n*, 565 F.3d 846, 852 (Fed. Cir. 2009) ("*Amgen I*") (analyzing applicability of safe harbor after party "had completed its submission to the FDA"). That is not the case here— it is undisputed that, at the time of the TCT conference, Myval had not yet received FDA approval. Indeed, Edwards' "post-approval" argument would mean that the safe harbor could never apply to any device that has previously been approved in any country outside the U.S. That is clearly wrong.

Finally, Edwards' assertion that Meril had "no genuine plans" to use the Landmark Trial for FDA approval ignores the evidence. Brief at 44. As the district court correctly found, "[i]t is undisputed that as of the time of the TCT Conference, Meril had taken significant steps towards obtaining FDA approval for the Myval System, including: (1) preparing a formal clinical trial synopsis for its Landmark Trial; (2) preparing a draft presubmission to seek FDA input on its clinical trial; (3) communicating with the FDA regarding Meril's proposed clinical

study and its presubmission; and (4) hiring an FDA consultant to help with the FDA presubmission." Appx9 (internal citations omitted); Appx371; Appx376-380; Appx382-386; Appx 1145-1147; Appx1203-1216. In addition, Meril was specifically discussing the Landmark Trial with the FDA to ensure results from that study could be used to support FDA approval. Appx445-495; Appx376-378; Appx382-386. Edwards did not dispute any of these facts at the district court, nor does it dispute them here.

In support of its "no genuine plans" argument, Edwards alleges that "Meril routinely ignored its own FDA consultant and FDA guidance." Brief at 44. Edwards cites to correspondence where the FDA consultant informed Meril that he believed that the FDA would require 50% of the clinical trial patients to be enrolled in the U.S., but Meril initially suggested 33% to the FDA. Appx1036; Appx1047; Appx1049-1050. This is not Meril "ignoring" its FDA consultant or FDA guidance. Meril's Senior Vice President explained that, because clinical trials in the United States are significantly more expensive than clinical trials outside the U.S., Meril wanted to see if the FDA might allow for a lower percentage of U.S. patients so it initially proposed having one-third of patients in the U.S. Appx1194-1195; Appx1198-1200. When the FDA requested that Meril increase the number of U.S. patients in the Landmark Trial to 50%, Meril provided a supplemental presubmission that revised the proposed study so that half of the

patients were in the U.S. Appx1225-1241. None of this correspondence supports Edwards' "no genuine plans" argument.

**That FDA presubmissions are voluntary and precede an IDE application does not matter.** The district court noted that Meril's presubmission and its communications with the FDA (among other undisputed facts) showed that Meril had already taken significant steps towards obtaining FDA approval for Myval before it attended the TCT conference in September 2019. Appx9. Edwards states in conclusory fashion that "[t]he district court [] failed to consider the preliminary and voluntary nature of Meril's FDA presubmissions." Brief at 45. But the "preliminary" or "voluntary" nature of the FDA presubmission is not relevant. Indeed, the safe harbor does not require any interaction with the FDA at all. The Supreme Court has made clear that the safe harbor can apply at any stage, and certainly well before any communications with the FDA or any application for FDA approval has been filed. *Merck KGaA*, 545 U.S. at 202, 205 ("There is simply no room in the statute for excluding certain information from the exemption on the basis of the phase of research in which it is developed or the particular submission in which it could be included."); *see also Abtox*, 122 F.3d at 1027 (safe harbor applies where defendant has not yet "filed an application for approval with the FDA"). The district court did not err in rejecting Edwards' argument, which is contrary to binding Supreme Court and Federal Circuit precedent.

**Finally, that Meril contacted the FDA after consulting with attorneys about transporting Myval samples to TCT, or after a seizure in France, is also not relevant.** Brief at 44. As explained above, nothing in the safe harbor statute requires a party to contact the FDA at all, let alone requiring specific timing. Not surprisingly, Edwards fails to identify any case in which the timing of a party's contact with the FDA governed application of the safe harbor. Likewise, a seizure in France has nothing to do with the safe harbor. These points are completely irrelevant.

## IV. THE DISTRICT COURT'S ORDER DOES NOT RELY ENTIRELY ON THE NILAY LAD DECLARATION AND THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT NILAY LAD HAD PERSONAL KNOWLEDGE OF THE FACTS IN HIS DECLARATION

Edwards is not correct that the district court relied on Nilay Lad's Declaration "as the sole basis for finding that Meril's importation 'was reasonably related to the submission of information to the FDA.'" Brief at 27, 41-42. Edwards' argument is based entirely on one sentence in the order that includes a citation to the Lad Declaration. Brief at 42 (pointing to first sentence on Appx10, which cites to Appx372-374 (Lad Decl. ¶¶ 13-15, 17)). But that sentence is clearly summarizing the district court's conclusion based on the court's analysis in the prior nine pages. And those prior nine pages cite to numerous contemporaneous documents, Edwards' admissions, and other evidence. The district court's order

cannot reasonably be read as resting entirely on three paragraphs of the Lad Declaration, as Edwards argues.

Edwards is also not correct that Nilay Lad lacked personal knowledge of the facts in his declaration. Before the district court, Edwards argued that Nilay Lad lacked personal knowledge of "Meril's purpose for importing the Myval Devices."[4] Appx557. The district court overruled Edwards' objection, finding that "Mr. Lad's declaration adequately establishes personal knowledge." Appx10, n.4. Edwards also incorrectly suggests that this Court should review the district court's evidentiary ruling *de novo*. But evidentiary rulings are not unique to patent law and are reviewed under the law of the regional circuit—here, the Ninth Circuit. *Applied Med. Res.*, 435 F.3d at 1365 ("[w]e review evidentiary rulings of the

---

[4] Before the district court, Edwards only challenged the Lad Declaration and only on the basis that Mr. Lad allegedly lacked personal knowledge of "Meril's purpose for importing the Myval Devices." Appx557. Edwards cannot raise new evidentiary objections on appeal. *See, e.g.*, *In re Google Tech. Holdings LLC*, 980 F.3d 858, 863 (Fed. Cir. 2020) ("We have regularly stated and applied the important principle that a position not presented in the tribunal under review will not be considered on appeal in the absence of exceptional circumstances."); *Padgett v. Wright,* 587 F.3d 983, 986 n.2 (9th Cir. 2009). To the extent Edwards purports to challenge declarations of other Meril employees or raise new objections to the Lad Declaration, those objections are waived. *See, e.g.*, *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1154 n.5 (Fed. Cir. 2011) ("evidentiary objections not raised before the trial court are deemed waived"). In any event, Mr. Lad is the Senior Manager for Research and Development and Intellectual Property Rights at Meril, had been working for Meril for 9 years, and had personal knowledge of basic FDA requirements for medical devices. Appx370; Appx612. In addition, these same points are in Mr. Bhatt's declaration (Appx296) as well as in FDA regulations and communications in the record (Appx376-379; Appx382-386; Appx506-515; Appx521-538; Appx1243-1298; Appx1300-1321).

district court applying the law of the regional circuit"). The Ninth Circuit reviews evidentiary rulings for an abuse of discretion, under which reversal is possible only "when the appellate court is convinced firmly that the reviewed decision lies beyond the pale of reasonable justification under the circumstances." *Harman v. Apfel*, 211 F.3d 1172, 1175 (9th Cir. 2000); *see also InTouch Techs.*, 751 F.3d at 1339; *Sea-Land Serv., Inc. v. Lozen Int'l, LLC*, 285 F.3d 808, 813 (9th Cir. 2002).

The district court's finding that Mr. Lad had personal knowledge was not an abuse of discretion. As the district court explained, it is undisputed that Mr. Lad personally transported the Myval devices to the TCT conference, and he testified that he consulted with counsel and Mr. Bhatt—Meril's "principal recruiter for clinical trials" (Brief at 36)—about bringing the devices to the TCT conference. Appx10, n.4; Appx372; Appx1100; Appx1104-1105. Nilay Lad's direct participation in these events establish his personal knowledge. *See, e.g.*, *Navarrete v. Kinkisharyo Int'l, LLC*, 845 F. App'x 515, 518 (9th Cir. 2021) (declaration sufficiently established personal knowledge regarding why the plaintiff was fired because the witness "was a percipient witness who observed the activity for which [the plaintiff] was fired, participated in the investigation into timecard fraud, identified [the plaintiff] in the surveillance footage, and was present at [the plaintiff]'s termination meeting").

Edwards' argument that Mr. Lad could not have personal knowledge because "[h]is job responsibilities . . . had nothing to do with . . . transporting devices to trade shows" lacks merit. Brief at 46. It is well established that an employee (like *any* percipient witness) can have personal knowledge of events that he/she personally participates in, even if those activities are outside of his/her formal job responsibilities. *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990) (finding personal knowledge based on "the nature of their participation in the matters to which they swore"); *Navarrete*, 845 F. App'x at 518 (finding personal knowledge where witness "was a percipient witness who observed . . . , participated . . . , and was present at" the events the testimony related to). Edwards does not dispute that Mr. Lad personally carried the Myval devices to the TCT conference or that he personally met with Mr. Bhatt and counsel to understand why. It is difficult to imagine anyone with better personal knowledge.

Edwards' cited case law also does not support its position. Brief at 45-46. In *Villiarimo v. Aloha Island Air, Inc.*, a wrongful termination plaintiff alleged that she was punished more severely than her male counterparts, but cited no evidence to support that assertion and "provide[d] no indication how she knows this to be true." 281 F.3d 1054, 1059 (9th Cir. 2002). In *Hopkins v. Andaya*, the witness' litigation testimony about his injuries conflicted in many respects with his

statements in a contemporaneous medical report. 958 F.2d 881, 886-888 (9th Cir. 1992), *as amended* (Mar. 24, 1992), *overruled on other grounds*. Here, Mr. Lad ***personally*** transported the Myval devices and ***personally*** consulted with counsel and Mr. Bhatt. The district court's conclusion that Mr. Lad had personal knowledge of Meril's purpose for importing the Myval devices was not an abuse of discretion.

Finally, Edwards changes direction and argues that Nilay Lad's Declaration only implies, but does not actually state, that Meril's purpose for importing the Myval devices was to recruit investigators. Brief at 37. Setting aside the inconsistency in Edwards' arguments, as the district court correctly found, the Lad Declaration is abundantly clear that Meril brought the Myval samples to TCT to identify and enlist potential clinical trial investigators. The Declaration states that: (1) "TCT [ ] provided a valuable opportunity for Meril to . . . identify potential clinical researchers for the FDA clinical trials for the Myval System," (Appx372); (2) Mr. Lad transported the Myval Samples "FOR DEMO PURPOSE ONLY AT TCT" (*id.*); and (3) Mr. Lad hand-carried the Myval samples to the TCT conference to "show[] the Myval System to potential clinical investigators at the TCT Conference" (Appx373-374). In addition, Mr. Lad and Mr. Bhatt repeatedly explained during their depositions that Meril brought the Myval samples to TCT to identify FDA clinical trial investigators. *See* Appx1167-1168; Appx1168-1169;

Appx1176-1177; Appx1107-1108; Appx1110-1111; *see also* Appx296; Appx860. As the district court concluded, Edwards' challenges to Nilay Lad's Declaration lack merit, and the district court certainly did not abuse its discretion.

## V. THE DISTRICT COURT DID NOT RELY ON MERIL'S ALLEGED SUBJECTIVE INTENT FOR THE IMPORTATION

Edwards argues that, because Meril did not actually use the Myval devices at the TCT conference, the "only evidence connecting the importation to obtaining FDA approval is evidence of Meril's subjective intent." Brief at 49-50. This is not correct. Indeed, the district court concluded that Meril's importation of the two devices was reasonably related to FDA approval based on a long list of ***objective*** evidence, including: (1) Meril had taken significant steps toward obtaining FDA approval for Myval prior to the TCT conference; (2) the TCT conference is attended by leading cardiovascular clinicians who are potential clinical trial investigators; (3) Meril met with potential clinical trial investigators for Myval at the TCT conference and also held an additional investigator meeting at a nearby restaurant; (4) before the conference, Meril informed potential clinical trial investigators that it would offer "hands-on and [virtual reality] VR sessions," in which the Myval devices are used with a simulator to educate those investigators about how to implant a Myval heart valve in a patient; and (5) there were no sales or offers to sell Myval at the conference. Appx9; Appx371-373; Appx517; Appx961; Appx774-783; Appx1154; Appx1218; Appx1220-1223; Appx398;

Appx892; Appx1167-1168; Appx1429-1430. None of this is evidence of subjective intent. Edwards also points to no subjective intent evidence discussed or cited in the district court's order. There is none.

Edwards next argues that the district court erred in not considering alleged evidence of commercial intent. In fact, a long line of cases makes clear that underlying purposes and intent are not relevant to the safe harbor inquiry. *See, e.g.*, *Momenta I*, 809 F.3d at 619 ("[t]he breadth of the exemption [under Section 271(e)(1)] extends even to activities the 'actual purpose' of which may be 'promot[ional]' rather than regulatory, at least where those activities are 'consistent with the collection of data necessary for filing an application with the [FDA]'"); *Abtox*, 122 F.3d at 1030 ("intent or alternative uses are irrelevant to [defendant's] qualification to invoke the section 271(e)(1) shield"). Edwards nevertheless argues that the *Abtox* and *Amgen II* cases "confirm[] that evidence of commercial intent is at least probative of whether use of the patented process is reasonably related to seeking FDA approval." Brief at 49. Edwards relies on this single sentence from *Abtox*: "As long as the activity is reasonably related to obtaining FDA approval, [the accused infringer's] intent or alternative uses are irrelevant to its qualification to invoke the section 271(e)(1) shield." *Id.* On the contrary, the first part of this sentence—"[a]s long as the activity is reasonably related to obtaining FDA

approval"—simply paraphrases the safe harbor statute. It does not say evidence of commercial intent "is at least probative" or sometimes relevant, as Edwards argues.

Similarly, *Amgen II* does not hold that evidence of commercial intent is relevant. Here again, Edwards relies on a portion of a single sentence from *Amgen II* that says Hospira's "decision to manufacture its . . . 'commercial inventory' was not dispositive of the Safe Harbor defense, but . . . this evidence was probative of whether Hospira's use of Amgen's patented process was reasonably related to seeking FDA approval." Brief at 40 (quoting *Amgen II*, 944 F.3d at 1340). This sentence does not mention intent at all. As the district court explained in rejecting Edwards' argument:

> Hospira objected to part of the jury instruction, which stated that "[i]f Hospira has proved that the manufacture of a particular batch was reasonably related to developing and submitting information to the FDA in order to obtain FDA approval, Hospira's additional underlying purposes for the manufacture and use of that batch do not remove that batch from the Safe Harbor defense." *Id*. at 1338. In finding no legal error with this jury instruction, the Federal Circuit in *Amgen* [*II*] affirmed that "*underlying purposes do not matter* as long as Hospira proved that the manufacture of any given batch of drug substance [the accused activity] was *reasonably related to developing information for FDA submission*." *Id*. at 1339 (emphasis added).

Appx15. Stated another way, *Amgen II* confirms that "underlying purposes do not matter." The language in *Amgen II* that the accused activity be "reasonably related to developing information for FDA submission" is paraphrasing the statute, not

creating some exception when intent is relevant. The district court correctly applied this Court's safe harbor case law.[5]

Edwards never actually argues that Section 271(e)(1) requires an "actual use," as it did before the district court, so that argument is waived. Brief at 50 ("to the extent the safe harbor statute requires an 'actual use'"). But even if this Court considers that argument, the district court correctly explained that Edwards' "actual use" argument is contrary to the actual text of Section 271(e)(1):

> The statute lists each of the possibly infringing acts (making, using, offering to sell, selling, and importing) separately, making clear that importation by itself (without actual use) can fall within the safe harbor. The clause "solely for uses reasonably related to the development and submission of information" to the FDA also does not require an "actual use." As the Federal Circuit has explained, the safe harbor applies "[a]s long as the [allegedly infringing] activity [*e.g.*, making, using, selling, offering for sale, and importing] is reasonably related to obtaining FDA approval." *Abtox*, 122 F. 3d at 1030.

Appx8. Edwards' "actual use" argument would mean that, in addition to the possibly infringing acts recited in Section 271(e)(1) (*e.g.*, making, using, offering to sell, selling, and importing), there would also have to be a use of the patented invention for the safe harbor to apply. That is not what the statute says and no case supports Edwards' position.

---

[5] While the district court's order on Meril's motion to dismiss incorrectly stated that *Amgen II* allows consideration of "commercial intent" (Appx213), the district court later corrected this error in its order on Meril's summary judgment motion (Appx15).

Next, Edwards argues that the district court "erred in holding that 'demonstrations at medical conferences are covered by the Section 271(e)(1) safe harbor,' regardless of actual use or intended use." Brief at 22, 51. This is not what the district court held. In fact, in ruling on Meril's motion to dismiss on the safe harbor issue, the district court explained that *Intermedics* and *Chartex* do *not* establish "a 'per se' rule exempting conference displays from infringement"—*e.g.*, regardless of actual use or intended use or as a matter of law. Appx212. The district court thus allowed Edwards to take extensive fact discovery regarding Meril's safe harbor defense. Appx1093-1094. Edwards' suggestion that the district court applied a "per se" rule mischaracterizes the district court's holding.

Finally, Edwards' attempt to distinguish *Telectronics* and *Intermedics* (by repeating the same argument the district court rejected) also fails. Brief at 52; *see* Appx1082. Edwards asserts that *Telectronics* and *Intermedics* involved an "actual demonstration," but this just recycles Edwards' "actual use" argument, which is incorrect for all the reasons discussed above and in the district court's order. Appx8. Edwards' argument that the defendants in those cases already had an IDE fails as a matter of law because, as discussed above, it is well established that the safe harbor does not require a party to have already filed an IDE or to have even contacted the FDA. *Merck*, 545 U.S. at 202. Finally, while Edwards disputes Meril's purpose for importing the Myval devices, underlying purposes are not

relevant. *Momenta I*, 809 F.3d at 619; *Amgen II*, 944 F.3d at 1339. In addition, for all of the reasons discussed in Section III, Edwards' arguments do not create any genuine issue of material fact that Meril's importation was reasonably related to recruiting clinical trial investigators for FDA approval.

## CONCLUSION AND RELIEF SOUGHT

For the foregoing reasons, this Court should affirm the district court's grant of summary judgment with respect to Edwards' patent infringement claims.

Dated: December 16, 2022

Respectfully submitted,

By: */s/ J. David Hadden*
J. David Hadden

FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Telephone: (650) 335-7684

*Attorneys for Defendants - Appellees*
MERIL LIFE SCIENCES PVT. LTD.,
AND MERIL, INC.

**CERTIFICATE OF SERVICE**

The undersigned certifies that a true and correct copy of the foregoing **DEFENDANTS – APPELLEES' RESPONSIVE BRIEF** was filed with the Clerk of the United States Court of Appeals for the Federal Circuit and served on all counsel of record via electronic mail or CM/ECF delivery, on December 16, 2022.

Dated: December 16, 2022

Respectfully submitted,

By: */s/ J. David Hadden*
J. David Hadden

FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Telephone: (650) 335-7684

*Attorneys for Defendants - Appellees*
MERIL LIFE SCIENCES PVT. LTD.,
AND MERIL, INC.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1). The brief contains 11,879 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

2. The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman.

Dated: December 16, 2022

Respectfully submitted,

By: */s/ J. David Hadden*
J. David Hadden

FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Telephone: (650) 335-7684

*Attorneys for Defendants - Appellees*
MERIL LIFE SCIENCES PVT. LTD., AND MERIL, INC.