**No. 22-1877**

**IN THE**
# United States Court of Appeals
**FOR THE FEDERAL CIRCUIT**

EDWARDS LIFESCIENCES CORPORATION, EDWARDS LIFESCIENCES LLC,

*Plaintiffs- Appellants,*

*v.*

MERIL LIFE SCIENCES PVT. LTD., MERIL, INC.

*Defendants – Appellees.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA
CASE NO. 4:19-CV-06593-HSG

## REPLY BRIEF OF APPELANTS EDWARDS LIFESCIENCES CORPORATION AND EDWARDS LIFESCIENCES LLC

Steven M. Hanle, *Principal Attorney*
**STRADLING YOCCA CARLSON & RAUTH PC**
660 Newport Center Drive, Suite 1600
Newport Beach, CA 92660-6422
(949) 725-4000

Christy G. Lea
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA 92614
(949) 760-0404

Carlo Van den Bosch
Gazal Pour-Moezzi
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
650 Town Center Dr., 10th Floor
Costa Mesa, CA 92626
(714) 513-5100

*Attorneys for Plaintiffs - Appellants Edwards Lifesciences Corporation and Edwards Lifesciences LLC*

January 17, 2023

# CERTIFICATE OF INTEREST

Counsel for Plaintiffs-Appellants Edwards Lifesciences Corporation and Edwards Lifesciences LLC certify the following:

1. The full name of every party represented by me is: Edwards Lifesciences Corporation, Edwards Lifesciences LLC

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: None.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are: None.

4. The name of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this Court (and who have not or will not enter an appearance in this case) are:

Stradling Yocca Carlson & Rauth, P.C.: Matthew Robert Stephens*
Sheppard Mullin Richter & Hampton LLP: Michelle LaVoie Wisniewski, and Anne-Marie D. Dao
Knobbe Martens Olson & Bear LLP: Brian C. Horne, Ioanna Sophia Bouris, and Adam Rolando Aquino*

*No longer with the firm.

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal: None.

6. Information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees): None.

Dated: January 17, 2023

By: */s/ Christy G. Lea*
Christy G. Lea

*Attorney for Plaintiffs-Appellants*
*Edwards Lifesciences Corporation and*
*Edwards Lifesciences LLC*

# TABLE OF CONTENTS

**Page No.**

I. SUMMARY OF REPLY ARGUMENTS ........................................ 1

II. THE DISTRICT COURT FAILED TO CREDIT EVIDENCE THAT MERIL IMPORTED THE MYVAL DEVICES FOR A COMMERCIAL USE, NOT TO RECRUIT CLINICAL INVESTIGATORS FOR AN FDA TRIAL ........................................ 5

III. THE DISTRICT COURT FAILED TO CREDIT EVIDENCE THAT THE LANDMARK TRIAL WAS NOT REASONABLY RELATED TO FDA SUBMISSION ........................................ 12

IV. THE DISTRICT COURT ERRED BY INFERRING THAT MERIL'S INFRINGING IMPORTATION WAS FOR (A) RECRUITING CLINICAL INVESTIGATORS, AND (B) FOR A CLINICAL TRIAL RELATED TO SUBMITTING INFORMATION TO THE FDA ........................................ 14

V. THE DISTRICT COURT MISINTERPRETED THE LAW REGARDING DEMONSTRATING MEDICAL DEVICES AT MEDICAL CONFERENCES........................................ 19

VI. THE DISTRICT COURT IMPROPERLY RELIED ON INCOMPETENT DECLARATION TESTIMONY ........................................ 24

VII. THE DISTRICT COURT RELIED ON SUBJECTIVE EVIDENCE OF MERIL'S PURPOSE, BUT IGNORED SUBTANTIAL CONTRADICTORY EVIDENCE........................................ 26

CONCLUSION AND RELIEF SOUGHT ........................................ 31

# TABLE OF AUTHORITIES

**Page No(s).**

*Abtox, Inc. v. Exitron Corp.*,
122 F.3d 1019 (Fed. Cir. 1997) .................................................... 29

*Amgen Inc. v. Hospira, Inc.*,
944 F.3d 1327 (Fed. Cir. 2019) (*Amgen II*).......................................... *passim*

*Amgen Inc. v. Int'l Trade Comm'n*,
565 F.3d 846, 852 (Fed. Cir. 2009) (*Amgen I*) ........................................... 19

*Chartex Int'l, PLC v. M.D. Pers. Prods. Corp.*
1992 U.S. Dist. LEXIS 22905 (N.D. Cal. Aug. 20, 1992) .......................... 23

*Intermedics, Inc. v. Ventritex, Inc.*,
775 F. Supp. 1269 (N.D. Cal. 1991) ("*Intermedics I*") ........................ *passim*

*Intermedics, Inc. v. Ventritex, Inc.*,
991 F.2d 808, 1993 WL 87405 (Fed. Cir. Feb. 22, 1993)
("*Intermedics II*").......................................................................... 21, 22

*Merck KGaA v. Integra Lifesciences I, Ltd.*,
545 U.S. 193 (2005)......................................................................... 4, 20

*Momenta Pharms., Inc. v. Teva Pharms. USA, Inc.*,
809 F.3d 610 (Fed. Cir. 2015) .............................................................. 29, 30

*Proveris Sci. Corp. v. Innovasystems, Inc.*,
536 F.3d 1256 (Fed. Cir. 2008) ................................................................... 23

*Telectronics Pacing Sys., Inc. v. Ventritex, Inc.*,
982 F.2d 1520 (Fed. Cir. 1992) ........................................................... *passim*

## OTHER AUTHROTIES

21 C.F.R. §870.3925 ........................................................................................ 7

Fed. R. of App. P. 32......................................................................................... 2

35 U.S.C. 271 ............................................................................................ *passim*

## I. SUMMARY OF REPLY ARGUMENTS

The contemporaneous evidence and inferences that must be drawn in favor of non-movant Edwards would permit a reasonable jury to find that Meril imported its accused Myval Devices for use as a sales tool, and not for recruiting clinical investigators. A reasonable jury could also find that Meril fabricated its story about importing the Myval Devices for a purpose related to submitting data to the FDA, when in fact it had no planned domestic patients or domestic clinical trial sites as it knew the FDA would require.

Nevertheless, Meril as the moving party defends the district court's erroneous summary judgment by: (1) making numerous inferences in its favor regarding a connection between importing the Myval Devices and recruiting clinical investigators; (2) ignoring the contemporaneous documentary evidence that contradicts the testimony of Meril's witnesses regarding the purpose for the importation and any connection between the Landmark Trial and FDA regulatory approval; and (3) mischaracterizing facts as "undisputed" by simply ignoring the contrary evidence.

None of Meril's arguments overcome the errors in the district court's decision. The district court made multiple inferences in favor of Meril as the moving party, ignoring or giving short shrift to substantial evidence from which a reasonable jury can infer that Meril imported the Myval Devices solely for use as a

commercial sales tool, and not "solely for uses reasonably related to the development and submission of information" to the FDA.

In making improper inferences, the district court ignored the most probative evidence of the solely commercial purpose of Meril's importation. It also failed to follow this Court's recent holding that a commercial purpose may be probative of whether an otherwise infringing act is "solely for uses reasonably related" to a regulatory submission. *Amgen Inc. v. Hospira, Inc.*, 944 F.3d 1327, 1340 (Fed. Cir. 2019) (*Amgen II*) (upholding jury's finding that manufacturing batches for commercial inventory was not exempt under Section 271(e)(1)). Crucially, in a document entitled "Instructions for TCT 2019 for Myval," Meril instructed its employees attending the TCT tradeshow about the Myval "demo units." Meril explicitly instructed its employees that "You can make offer [for sales] for other countries" outside the United States. Appx909. Neither that document, nor any other, mentions using the imported Myval Devices to recruit clinical investigators. The holding of *Amgen II*, that evidence of commercial purpose is probative of the safe harbor analysis, is particularly relevant here because Meril decided not to use the devices at TCT despite importing them, for reasons that are now heavily disputed.

In holding that Meril's importation was reasonably related to the recruitment of investigators for an FDA trial, the district court drew two principal inferences that are contradicted by the evidence. First, the district court erroneously accepted

that Meril imported the Myval Devices to recruit clinical investigators when all of the contemporaneous documentary evidence—including the Instructions—ties the importation to marketing and sales efforts directed to foreign physicians. In contrast, none of the contemporaneous documentary evidence regarding importing the Myval Devices even mentions recruiting clinical investigators. Recruiting is not mentioned in the Instructions or in the two invitations sent to thousands of physicians, touting that Myval Devices had been CE Approved and would be available for "hands-on and VR sessions" at the TCT conference. Appx909; Appx746-748; Appx885. Conversely, none of the documents regarding recruiting clinical investigators for the Landmark Trial ever references the Myval Devices. Appx571; Appx961; Appx774-783. Substantial evidence thus precludes the inference that Meril imported the Myval Devices solely for uses reasonably related to recruiting clinical investigators.

The second improper inference is that the Landmark Trial—which is the only purported link between the infringing importation and a protected FDA regulatory purpose—represented "significant steps towards obtaining FDA Approval." Appx9; *see* Meril Brief at 2, 16, 38. Substantial evidence shows that the Landmark Trial was—and remains to this day—completely unrelated to developing and submitting data for the FDA. The evidence shows instead that the Landmark Trial was (1) an OUS study, (2) undertaken after regulatory approval (3) and for the purpose of marketing Myval in Europe.

Thus, both principal inferences in favor of Meril were in error. Instead, substantial evidence supports an inference in favor of Edwards that Meril imported the Myval Devices to support commercial sales, and not "solely for uses reasonably related to" recruiting clinical investigators. Even if Meril planned to use the Myval Devices to recruit clinical investigators, documentary evidence shows that the foreign Landmark trial was not "reasonably related to the development and submission of information" to the FDA. If this Court finds a genuine issue of fact concerning <u>either</u> inference, the district court's ruling must be reversed.

Meril fails to reconcile another fundamental error by the district court, namely its inaccurate assessment that "[a]ccording to the Federal Circuit, demonstrations at medical conferences are covered by the Section 271(e)(1) safe harbor." Appx8. This overstates the law and was the errant premise for the ruling that "transporting a device to a medical conference is a necessary and predicate act for displaying the device, such that the transportation of an accused device into a country for display at a medical conference is also exempt under the safe harbor." Appx9. But the cases cited by the district court and Meril—*Telectronics, Intermedics*, and *Chartrex*—do not support these generalizations. Rather, <u>each</u> accused activity "must be evaluated separately to determine whether the exemption applies." *Merck KGaA v. Integra Lifesciences I, Ltd.,* 545 U.S. 193, 200 (2005); *Amgen II,* 944 F.3d at 1339 (finding some manufacturing activities fell within the

safe harbor and others did not). At best, *Telectronics, Intermedics*, and *Chartrex* stand for the proposition that, when there is undisputed evidence that products were actually used to recruit clinical investigators for FDA clinical trials, evidence of collateral uses for commercial purposes does not abrogate the safe harbor protection. Here, Meril admits that it did <u>not</u> use the Myval Devices to recruit clinical investigators, and substantial evidence rebuts Meril's claimed purpose for importing the Myval Devices and conducting the Landmark Trial. The district court's misunderstanding of the law thus fueled its improper inferences.

## II. THE DISTRICT COURT FAILED TO CREDIT EVIDENCE THAT MERIL IMPORTED THE MYVAL DEVICES FOR A COMMERCIAL USE, NOT TO RECRUIT CLINICAL INVESTIGATORS FOR AN FDA TRIAL

Strong contemporaneous evidence supports the following chronology regarding Meril's decision to import its Myval Devices to TCT. The Myval Devices received CE certification in April 2019, allowing Meril to market and sell them for use in Europe. Appx370. In May 2019, Meril began planning its Landmark Trial, a post-approval, three-arm trial in Europe and other countries to compare Myval with the market leading devices in Europe, with no planned sites in the U.S. Appx298, Appx334 (Myval – Global Clinical Program, March 2019); Appx588-589; Appx912 (Myval – Global Clinical Program, May 2019); Appx657.

In July 2019, Meril prepared a draft synopsis of the Landmark Trial, describing a three-arm comparative study (in Europe, where Myval was already

approved) and stating that "In Australia and New Zealand it is a prospective, single arm, multi-center pre-market study." Appx1203. The draft synopsis does not mention the FDA or any sites in the U.S. Appx1203-1216. At the time Meril prepared this synopsis, it knew that (1) regulatory approval was typically based on a single-arm study (Appx657), and (2) the FDA would require at least 50% of patients at U.S. trial sites. Appx677; Appx716. Thus, Meril never planned the Landmark trial as an "FDA clinical trial."

By August 2019, Meril had decided to bring sample Myval Devices to the September 2019 TCT conference in San Francisco. On August 23, 2019, a few months after infringing Myval Devices were seized at a European conference, Meril consulted attorneys about importing them to the United States. Appx610-613; Appx869-873. Having attended TCT in prior years, Meril knew that it presented "unparalleled marketing opportunities" to "increase visibility of products and services" Appx730. It also knew that the conference would be attended by thousands of medical professionals from Europe, where Myval was already approved. Appx737.

By August 26, 2019, Meril had made the decision to import the Myval Devices to take advantage of the marketing opportunities at TCT. Meril's marketing personnel drafted an invitation to visit Meril's TCT booth: "Experience Meril's technologies & hands-on simulation of Meril's TAVR system — Myval THV." Appx884-886. On August 27, 2019, Meril marketing personnel sent the

invitation to 3,101 medical professionals on the TCT 2019 pre-registration list. Appx888. The invitation did not mention any purported need for, or recruitment of, clinical investigators. Appx884-886.

Meril undertook no efforts relating to FDA approval for Myval until after it decided to import the Myval Devices. The earliest mention of the FDA in the documentary record is an email dated August 29, 2019 to the FDA's general customer service email address. The email asks perfunctory questions to which Meril already knew the answers: "Is it compulsory to perform a clinical study in US patients for this device?"[1] Compare Appx379 with Appx677 and Appx716 (where the Meril-email author admits "I always knew that a Class III type of device would require a U.S. clinical trial"). In light of this and other evidence, Meril's voluntary, premature, and ultimately pointless communications with the FDA were thus a mere pretext to attempt to manufacture a safe harbor so Meril could import the Myval Devices for commercial purposes. *See* Edwards' Opening Br. at 19-20.

While at TCT, Meril hosted a dinner meeting at a restaurant for a "discussion of Landmark trial planned in Europe." Appx961. Meril's communications regarding this meeting, from September 12-17, 2019, never mention any sample Myval Devices or hands-on sessions with Myval. Appx571;

---

[1] Meril also asked the FDA to confirm that its Myval heart valve implant was a Class III device (i.e., an implant). Appx379; 21 C.F.R. §870.3925.

Appx961; Appx774-783. Meril never planned to bring the sample Myval Devices to the dinner and did not do so. Appx618. The dinner was the only meeting Meril planned or held for clinical investigators at TCT. Appx647. And, despite Meril's claim that it attended TCT to recruit for U.S. clinical studies (Appx371-373), Meril invited only European physicians to the Landmark Trial dinner. Appx961; Appx774-783.[2] Meril did not use the imported Myval Devices in any purported meeting with potential clinical investigators at the TCT conference itself. Appx374.

In contrast with the investigator communications, which make no mention of Myval Devices, Meril's contemporaneous marketing and sales communications prominently promote hands-on sessions with the devices. On September 14, 2019, Meril sent an email blast to thousands of physicians and industry professionals registered to receive such communications regarding TCT, including hundreds based in Europe. Appx670; Appx889-893; Appx570; Appx745-748. The email blast advertised that Myval was "CE APPROVED," meaning that it could be sold commercially for use in Europe. *Id.* It touted Myval as "ensuring <u>predictable</u> clinical safety and efficacy outcomes," and invited physicians to "PARTNER THE FUTURE" keeping "PRECISION AT HEART". Appx746 (underlining added).

[2] In these same email chains, Meril describes to potential investigators the purpose of the Landmark Trial, after having already received approval in Europe: "we are now keen to further establish its [Myval's] scientific merit via a large European RCT [randomized clinical trial]." Appx779, Appx781.

This email blast differs substantially from Meril's direct and more formal communications with potential clinical investigators. *Compare* Appx746-748 *with* Appx961; Appx774-783.

Like Meril's earlier TCT invitation, the email blast also invited recipients to "have hands-on and VR sessions on Meril's TAVR system – Myval™ THV." Appx747. Sanjeev Bhatt testified that the hands-on sessions were "one of the early things that … the marketing group wants to … showcase at the TCT," (Appx670), thus linking them to marketing, and not to purported regulatory efforts. While Meril contends that this email blast invited "clinical trial investigators" to hand-on sessions (Meril Brief at 33), the email does not mention anything about clinical trials or recruiting clinical investigators. Meril also argues that a simulator is not a "sales prop," but ignores the evidence that its marketing group advertised and imported the simulator and that its principal recruiter of clinical investigators actually discouraged the use of a simulator. Appx669.[3]

On September 13, 2019, Meril's marketing personnel also updated its Myval brochure specifically for the TCT conference, again touting Myval as CE APPROVED and even providing "Myval – THV Ordering Information." Appx825-826, Appx852. <u>On the same day</u>, Meril employee Nilay Lad circulated a

[3] Meril argues that it is undisputed that it used the simulator to recruit clinical investigators on other occasions (Meril Brief at 32-33, citing Appx964), but the evidence it cites again promotes that Myval is CE APPROVED and does nothing to connect the simulator with recruiting *versus* marketing.

draft document entitled "Instructions for TCT 2019 for Myval THV System." Appx632; Appx907-909. The Instructions were conveyed to the 20-plus Meril employees attending TCT. Appx660-661. As Myval was approved for sale in Europe, but not the U.S., the Instructions stated: "Do not make any sales or offers for sale at the conference, or while in the United States for the US market. **You can make offer for other countries**." Appx909 (emphasis added). The Instructions further stated: "If possible, refer discussions of pricing, delivery, and other commercial topics to representatives outside the US … ." Appx909. The Instructions also directed Meril employees to use the Product Brochure approved by Sanjeev Bhatt that advertised Myval as "CE APPROVED" and included "Myval – THV Ordering Information" Appx825-826, Appx852. The Instructions permitted Meril employees to carry the Myval "demo units," but instructed them "do not carry too many …" Appx909. The demo Myval Devices were thus imported to support Meril's sales efforts to hundreds, if not thousands, of potential customer physicians from "other countries." Appx909; Appx735-737.

Meril's Instructions for how the demo Myval Devices could be used at TCT, like its invitation, email blast, and brochure, did not mention anything relating to recruiting clinical investigators at TCT. Appx907-909; Appx882; Appx884-886; Appx890-893; Appx746-748; Appx825-853. This crucial fact is book-ended by its converse. None of the relatively few communications about recruiting clinical investigators at TCT for the Landmark Trial in Europe mentions demo Myval

Devices. Appx571; Appx961; Appx774-783. Indeed, Meril never even planned to bring the Myval Devices to the dinner planned for clinical investigators and did not do so. Appx618.

Pursuant to Meril's marketing plans, Nilay Lad flew the Myval Devices to the United States, and brought them to the TCT conference in a small bag on September 24. Appx372-373. According to Meril, it decided not to display the Myval Devices because a simulator malfunctioned. Appx374. But this story is not plausible for at least three reasons. First, Meril had displayed the Myval Devices without a simulator at previous conferences. Appx570; Appx874-879; Appx618-619; Appx668-669. Second, Sanjeev Bhatt, who permitted the use of the Myval demo units in the Instructions, discouraged the use of simulators to recruit clinical investigators, believing them messy and unnecessary. Appx909; Appx669. Third, there is a complete lack of contemporaneous evidence supporting the "broken simulator" story. Appx618-619.[4]

The evidence supports a different inference. Meril imported the Myval Devices to promote commercial sales to European physicians attending TCT. But when Meril noticed the "team of attorneys" hired by Edwards "to monitor Meril's

[4] The district court improperly accepted Meril's "broken simulator" story, despite a complete lack of contemporaneous evidence supporting it (Appx5) and substantial evidence supporting a different inference.

activities" (after having seized infringing devices at a prior conference in Europe), Meril decided not to show them. *See* Meril Brief at 1; Appx640; Appx613.[5]

## III. SUBSTANTIAL EVIDENCE SUPPORTS THE INFERENCE THAT THE LANDMARK TRIAL WAS NOT REASONABLY RELATED TO FDA SUBMISSIONS

Consistent with its pre-TCT documents and communications, Meril's presentation at TCT regarding the Landmark Trial showed that it was to be conducted entirely outside the United States. Appx676-677; Appx923, Appx946-958. The presentation thus squarely contradicts Meril's self-serving declaration testimony that it was seeking to identify "potential researchers for its U.S.-based clinical trials." Appx372.

Later presentations, such as one dated November 17, 2019, also reported the Landmark Trial as an exclusively OUS study. Appx969, Appx996-1007. The brochure on Meril's website as of August 3, 2020 (which was continually updated) advertised the Landmark Trial as an OUS study with 50+ sites in Europe, Australia, and New Zealand. Appx591; Appx915-916. It acknowledged that the first patient would not be enrolled in the trial until late 2020, at the earliest. *Id.* Even as of today, Meril continues to report the Landmark Trial as a three-arm trial

---

[5] Meril's overtly commercial promotion of the infringing Myval Devices in the United States in 2019 led Edwards to file this case. Thus, Edwards opted not to challenge the district court's order with respect to Meril's importation of sample devices in 2016/2017 even though the timing of a cadaver study at the University of Washington and an animal study in New York supports the inference that they were related to the Indian clinical trial commenced approximately seven years ago, and not related to the development and submission of information to the FDA.

(Myval vs. Edwards' SAPIEN and Medtronic's Evolut) with 41 study locations, 40 in Europe, one in New Zealand, and none in the United States. See https://clinicaltrials.gov/ct2/show/NCT04275726?term=myval&draw=2&rank=2#:~:text=Show%2041%20study%20locations. No evidence suggests that Meril has ever attempted to obtain an Investigational Device Exemption (IDE) from the FDA to permit U.S. clinical trial sites. Rather, Meril admitted that it was nowhere near applying for an IDE and did not have a single U.S. investigation site lined up. Appx676-677, Appx691-692.

In contrast with the evidence that the Landmark Trial was unrelated to the development and submission of data to the FDA, the district court extensively relies on Meril's communications and presubmissions with the FDA in the fall of 2019. Appx3, Appx9. As addressed in Edwards' Opening Brief, Meril's pre-submissions: (i) were entirely voluntary; (ii) were years pre-mature as Meril was and remains nowhere close to submitting an IDE; (iii) asked questions to which it already knew the answers; and (iv) repeatedly ignored the advice of its own FDA consultant. Brief at 18-20. In light of the substantial evidence that the Landmark Trial was completely unrelated to FDA submissions, the evidence supports the inference that Meril's FDA communications were a mere pretext to manufacture a safe harbor defense.

Accordingly, the evidence regarding the nature of the Landmark Trial supports an additional inference that warrants reversal, namely that the foreign

Landmark Trial was **not** reasonably related to FDA regulatory approval, which Meril always knew would require at least half of the patients at U.S. trial sites. Appx677; Appx716.

## IV. THE DISTRICT COURT ERRED BY INFERRING THAT MERIL'S INFRINGING IMPORTATION WAS FOR (A) RECRUITING CLINICAL INVESTIGATORS, AND (B) FOR A CLINICAL TRIAL RELATED TO SUBMITTING INFORMATION TO THE FDA

The district court's findings regarding the importation of the Myval Devices for the TCT conference include improper inferences in favor of Meril, the moving party. First, the district court states: "The Court finds that the undisputed evidence gives rises to no genuine dispute of fact as to whether Meril's transportation of non-commercial Myval Samples to the TCT Conference is exempt under the safe harbor." Appx10. The district court thus inferred that the Myval Devices were "non-commercial" despite contrary evidence that Meril imported them to support commercial sales efforts. Appx907-909; Appx882; Appx884-886; Appx890-893; Appx746-748; Appx825-853.

Second, the district court states: "It is undisputed that Meril transported the medical device to the TCT Conference, which was attended by a large number of potential clinical trial investigators." Appx10. Similarly, Meril argues that it is "undisputed that the [TCT] conference … is often used to recruit clinical trial investigators." Meril Brief at 2 (citing Appx371-373, Appx517). But again, the district court and Meril disregard contrary evidence supporting a different

inference, namely that the TCT Conference was attended by hundreds, if not thousands, of potential Myval customers from Europe, where the Myval Devices were already approved, to take advantage of "unparalleled marketing opportunities" to "increase visibility of products and services." Appx730, Appx737. The district court disregarded that all of Meril's communications that reference the Myval Devices being present at TCT—the Instructions, the invitation, the brochure and the email blast—relate to marketing and sales. The district court also overlooked that none of the communications regarding "potential clinical trial investigators" mentions the Myval Device samples. And it failed to consider that Meril did not bring the Myval Devices to its dinner meeting for Landmark investigators and never planned to.

Third, the district court states: "It is also undisputed that Meril did not sell or offer to sell its medical device at the medical conference." Appx10. Meril extensively relies on this finding throughout its Responsive Brief. But this statement both overstates the evidence and misses the point. While Edwards' counsel acknowledged at the summary judgment hearing that it had not uncovered direct evidence of an actual Myval sale generated at TCT, there is still substantial evidence from which one can infer that sales activity did occur. For instance, the Instructions given to every Meril employee attending TCT stated that "You can make [sales] offer for other countries." Appx909.

Furthermore, Meril's act of importing the Myval Devices is the accused act of infringement—not a sale or offer for sale. And Meril admits there was no actual use of the imported Myval Devices to recruit clinical investigators—it never took them out of the bag. The relevant query under the statute is thus whether Meril imported the Myval Devices "solely for uses reasonably related to" developing and submitting data to the FDA—*i.e.*, did Meril import the Myval Devices for use as a sales tool or as a recruiting tool for clinical investigators? Again, substantial evidence supports the inference that Meril imported the Myval Devices for use as a sales tool, and not as a recruiting tool.

The district court makes essentially the same error in its fourth and concluding sentence: "Therefore, Meril's transportation of the Myval Samples to the TCT Conference, where Meril did not sell or offer to sell the device, was reasonably related to the submission of information to the FDA, including educating the investigators at the TCT about the Myval System." Appx10. But Meril admits that it did not use the imported Myval Devices to educate investigators at TCT about the Myval System. Appx373-374. And no contemporaneous evidence connects importing the Myval Devices to "educating the investigators." Rather, the contemporaneous evidence supports an inference that Meril imported the Myval Devices to support commercial sales and marketing, which does not invoke the safe harbor.

The district court's errors were not limited to inferring a connection between importing the Myval Devices and recruiting efforts. It also drew improper inferences about the Landmark Trial, which is the linchpin of Meril's safe harbor argument. The district court improperly found that the Landmark Trial represented "significant steps towards obtaining FDA approval for the Myval System," citing, among other things, that Meril had prepared "a formal clinical trial synopsis for its Landmark Trial." Appx9. But the document relied upon by the district court describes a three-arm comparative study in Europe, with a single arm pre-market cohort in Australia and New Zealand. Appx1203. There is no mention of any plan for the United States, and nothing to suggest any connection with FDA submissions. Appx1203-1216.

The following additional evidence regarding the nature of the Landmark Trial permits the inference that it was <u>not</u> reasonably related to developing and submitting data to the FDA.

- Before planning the Landmark Trial, Meril knew that FDA approval would require a single-arm study with at least half of the patients in the United States. Appx657; Appx677; Appx716.
- A May 2019 presentation (after CE approval in Europe) stated that the Landmark Trial would be a three-arm comparative trial with clinical sites in the EU and other countries, but not the United States. Appx588-589; Appx912.

- Meril's San Francisco dinner invitations for only European investigators describes the Landmark Trial as a "trial planned in Europe," where Myval was already approved. Appx961. There is no mention of the FDA or U.S. clinical trial sites. *Id.*
- Email chains regarding that dinner also describe the purpose of the Landmark Trial: after receiving approval in Europe, "we are now keen to further establish its [Myval's] scientific merit via a large European RCT." Appx779, Appx781.
- Since TCT, Meril has continued to describe the Landmark Trial in public presentations and government websites as a European trial, again without mentioning present or future U.S. clinical trial sites or anything connecting it to the FDA. Appx969, Appx996-997; Appx591; Appx915-916; https://clinicaltrials.gov/ct2/show/NCT04275726?term=myval&draw=2&rank=2#:~:text=Show%2041%20study%20locations.

Ignoring evidence of the actual purpose of the Landmark Trial, the district court instead credited Meril's *post hoc* assertion that "FDA approval can be supported by clinical trials that include patients both within and outside of the US." Appx9 at n.3 (emphasis added). The district court thus ignored its own earlier observation that "[n]ot all activities performed prior to FDA approval" fall within

the safe harbor exemption. Appx211 (citing *Amgen Inc. v. Int'l Trade Comm'n*, 565 F.3d 846, 852 (Fed. Cir. 2009) (*Amgen I*) (question of fact as to whether safe harbor applies where evidence suggests that some studies were conducted at the request of the marketing department for brand recognition purposes)).

Thus, Edwards presented evidence that raised a genuine issue of material fact that Meril imported the Myval Devices for commercial purposes and not for recruiting investigators to develop and submit information to the FDA. The district court erred by finding, as a matter of law, that Meril imported the Myval Devices for recruiting clinical investigators to develop and submit data to the FDA.

## V. THE DISTRICT COURT MISINTERPRETED THE LAW REGARDING DEMONSTRATING MEDICAL DEVICES AT MEDICAL CONFERENCES

As a principal basis for its ruling, the district court's order states: "According to the Federal Circuit, demonstrations at medical conferences are covered by the Section 271(e)(1) safe harbor." Appx8. Curiously, this holding contradicted the district court's earlier—and correct—holding that this Court's cases do not establish "a 'per se' rule exempting conference displays from infringement." Appx212. But in its summary judgment order, the district court failed to qualify its general statement, *e.g.*, demonstrations at medical conferences <u>for the purpose of recruiting clinical investigators for FDA clinical trials</u> are covered by the Section 271(e)(1) safe harbor. The district court's overstatement of the law was the errant premise for its ruling that "transporting a device to a medical

conference is a necessary and predicate act for displaying the device, such that the transportation of an accused device into a country for display at a medical conference is also exempt under the safe harbor." Appx9.

But the cases cited by the district court and in Meril's Brief—*Telectronics, Intermedics*, and *Chartrex*—do not support these sweeping generalizations. Indeed, the Supreme Court and this Court have held that each accused activity "must be evaluated separately to determine whether the exemption applies." *Merck,* 545 U.S. at 200; *Amgen II,* 944 F.3d at 1339 (finding some manufacturing activities fell within the safe harbor and other did not).[6] At best, *Telectronics, Intermedics*, and *Chartrex* stand for the proposition that, when there is undisputed evidence that products were actually used to recruit clinical investigators for FDA clinical trials, evidence of collateral uses for commercial purposes does not abrogate the safe harbor protection. Even this proposition is suspect since the statute only applies when the otherwise infringing act is "solely for uses reasonably related to the development and submission of information" to the FDA.

In *Telectronics*, the defibrillator device at issue had already received an IDE permitting FDA trials which were ongoing, and it was undisputed that there were actual demonstrations to recruit clinical investigators for these trials. *Telectronics*

[6] In *Merck*, the issue was whether Section 271(e)(1) could exempt general biomedical research to identify new pharmaceutical compounds, and there was no trade show demonstration and no dispute over whether the exemption applied to commercial uses. 545 U.S. at 201-208.

*Pacing Sys., Inc. v. Ventritex, Inc.*, 982 F.2d 1520, 1521 (Fed. Cir. 1992). The plaintiff argued that because the demonstrations were attended by non-physicians, the demonstrations were not "solely for uses reasonably related to the development and submission of information" to the FDA. *Id.* at 1523. This Court held:

> Absent some showing that Ventritex's purpose is disputed, … such demonstrations constitute an exempt use reasonably related to FDA approval, because device sponsors are responsible for selecting qualified investigators and providing them with the necessary information to conduct clinical testing.

*Id.* at 1523.

*Telectronics* thus recognizes that, had the plaintiff presented evidence that disputed the purpose of the demonstrations, summary judgment would have been improper. Here, Edwards presented substantial evidence that Meril imported the Myval Devices to support commercial sales efforts, and not to recruit clinical investigators. Summary judgment was therefore in error. *Telectronics* is also significant because it recognizes, consistent with *Amgen II*, that a commercial purpose is at least relevant to the safe harbor analysis. *Amgen II*, 944 F.3d at 1340.

In *Intermedics*, like *Telectronics*, the device had already received an IDE permitting US trials which were ongoing, and there were actual demonstrations to recruit clinical investigators for these trials. *Intermedics, Inc. v. Ventritex, Inc.*, 775 F. Supp. 1269, 1276 (N.D. Cal. 1991) ("*Intermedics I*"), *aff'd*, 991 F.2d

808, 1993 WL 87405, at *1 (Fed. Cir. Feb. 22, 1993) (unpublished) ("*Intermedics II*"). The plaintiff argued that demonstrations held after defendant had all the required investigators and were attended by individuals not qualified to serve as clinical investigators were nonexempt uses because they were not reasonably related to procuring FDA approval. *Intermedics II* at *5. Unlike here, the plaintiff in *Intermedics*

> does not dispute that the demonstrations were, in part, reasonably related to obtaining FDA approval, [but] plaintiff argues that defendants made an additional (perhaps secondary) use of the [device] at these conferences that was not reasonably related to generating data for the FDA and, instead, was solely related to increasing market awareness of the [device].

*Intermedics I* at 1288. On appeal, this Court relied on *Telectronics* in holding that "observation of [the device] at medical conferences by non-physicians does not impair the conclusion that such uses satisfy the requirements of § 271(e)(1). Further, it is unforeseeable how much data FDA will require Ventritex to submit during the approval process. Therefore, Ventritex's continuation of procuring potential investigators well into the FDA approval process does not mean that the demonstrations fail to satisfy the requirements of section 271(e)(1)." *Intermedics II* at *5.

In *Chartex*, the alleged infringement was the manufacturing of a device regulated by the FDA. Relying on *Intermedics*, the court held that the safe harbor applied because the evidence showed that the displayed devices were manufactured for FDA trials. *Chartex Int'l, PLC v. M.D. Pers. Prods. Corp.* 1992 U.S. Dist. LEXIS 22905, *7-8 (N.D. Cal. Aug. 20, 1992), *aff'd*, 5 F.3d 1505, 1993 WL 306169, *3 (Fed. Cir. 1993) (unpublished). There is no such evidence here. Moreover, this Court declined to adopt the accused infringer's proposition that "using a patented medical device will not constitute infringement so long as the device is not marketed for general sale during the life of the patent." *Chartex*, 1993 WL 306169 at *4.[7]

Here, unlike *Telectronics*, *Intermedics*, and *Chartex*, the evidence is undisputed that there was <u>no</u> IDE, that FDA trials were <u>not</u> ongoing, and that the Myval Devices were <u>not</u> actually used to recruit clinical investigators. The evidence is disputed, at best, as to Meril's purpose for importing the Myval Devices and any connection between the Landmark Trial and FDA approval. The district court's misunderstanding of the law thus fueled its improper inferences.

---

[7] Meril twice cites *Proveris Sci. Corp. v. Innovasystems, Inc.*, 536 F.3d 1256, 1263 (Fed. Cir. 2008) for the proposition that "demonstrating an implantable defibrillator at medical conferences was 'reasonably related' to FDA approval because it facilitated the selection of clinical trial investigators." Meril Brief at 18, 23. But *Proveris* had nothing to do with medical conferences and the quoted language is simply a recitation of the holding in *Telectronics*. *Id.* at 1263. Moreover, the Court held that the marketing and sale of a non-FDA-regulated device was not exempted from infringing a competitor's patent. *Id.* at 1265-66.

## VI. THE DISTRICT COURT IMPROPERLY RELIED ON INCOMPETENT DECLARATION TESTIMONY

Meril argues that the district court did not rely solely on Nilay Lad's Declaration for finding that Meril's importation was reasonably related to submitting information to the FDA. Meril Brief at 41. But the district court cites only the Lad Declaration to support its finding that Meril imported the Myval Devices to recruit clinical investigators, and ignores the contrary documentary evidence. Appx10 (citing Lad Decl. ¶¶13-15). While a footnote in the district court's order cites Lad's and Sanjeev Bhatt's deposition testimony and Mr. Bhatt's declaration, that testimony does not support the district court's finding that Meril imported the devices to recruit clinical investigators. Appx10 (citing Appx1167-69, Appx1107-08). Both Lad and Bhatt testified that the samples are used to educate clinicians on the device. Appx1167-1169, Appx1107-1108. But educating clinicians on a device is also part of marketing the device (see Appx909), and the testimony cited by the court did not tie educating clinicians to recruiting investigators. Bhatt's declaration cited by the district court merely stated that he attended TCT "to identify potential clinical researchers for Meril." Appx296. He did not profess any intent to use Myval Devices to recruit investigators for a study to gather data for the FDA. *Id.* Indeed, he preferred not to use sample devices. Appx669. The district court wrongly inferred that is what Bhatt meant despite the holes in his testimony and the contemporaneous evidence to the contrary.

Further, no testimony establishes Lad's personal knowledge of anything relevant other than acting as a courier for the Myval Devices. Moreover, Lad admitted that his job responsibilities relating to Myval were solely to manage litigation. Appx612. Lad had nothing to do with regulatory submissions, recruiting clinical investigators, marketing or sales of Myval Devices, or transporting devices to trade shows. Appx612-614. Thus, Meril failed to establish a foundation for him to testify about: (1) the FDA premarket approval process for Myval (Appx370-373 ¶¶5-6, 12); (2) Meril's communications with the FDA and its FDA consultant, and the implications of those communications (Appx371 ¶¶7-9, 19); (3) Meril's purported intent to recruit clinical investigators at TCT (Appx371-372 ¶¶10, 12); and (4) Meril's communications with purported clinical investigators at TCT (Appx373 ¶¶14-15). Lad's role as a mere courier to transport the Myval Devices does not establish a foundation for him to testify as to other facts relied on by the district court. Thus, the district court abused its discretion in relying on Lad's self-serving testimony.[8]

Regardless, instead of relying on contemporaneous documents showing that Meril imported the Myval Devices to support commercial efforts and acknowledging the lack of contemporaneous evidence connecting the importation

[8] Meril argues in a footnote that Edwards waived certain objections to Lad's Declaration. Meril Brief at 42 n.4 (citing Appx557). But Edwards objected to "paragraphs 5-12, and 15 of the Lad Declaration" as "inadmissible because the declaration fails to establish a foundation based on personal knowledge." Appx557-558.

to clinical investigators, the district court relied on self-serving, litigation-inspired witness testimony. Thus, the district court improperly credited the movant's conclusory testimony over the contrary documentary evidence.

## VII. THE DISTRICT COURT RELIED ON SUBJECTIVE EVIDENCE OF MERIL'S PURPOSE, BUT IGNORED SUBTANTIAL CONTRADICTORY EVIDENCE

Lastly, Meril fails to explain away the conundrum in the district court's ruling that, while purporting to apply an objective standard to determine whether Meril imported the devices solely for uses reasonably related to FDA submissions, it erroneously relied on subjective evidence of Meril's alleged purpose for the importation—because there was no evidence of an actual protected use. And herein lies a unique aspect of this case. Because Meril admits that there was no post-importation use of the Myval Devices, exempt under the statute or otherwise, the only possible basis to apply the safe harbor would be to consider Meril's purpose for the infringing importation. Upon crossing that Rubicon, the district court should have considered all of the evidence of Meril's purpose and made inferences based on that evidence in favor of the non- movant Edwards. It failed to do so.

As a threshold matter, again, the district court's order cites only the subjective Lad Declaration in ruling, based on supposedly undisputed facts, that Meril's importation was "reasonably related to the submission of information to the FDA… ." Appx10. Meril similarly argues that "undisputed evidence showed

that Meril's importation of two demonstration samples of the Myval device to a medical conference was reasonably related to recruiting investigators." Meril Brief at 3. But no objective evidence connects the alleged infringement—importing the Myval Devices—to recruiting clinical investigators for the submission of information to the FDA. This lack of connection precludes a defense under Section 271(e)(1), which exempts an otherwise infringing act only if it is "solely for uses reasonably related to the development and submission of information" to the FDA.

Here, all of the objective evidence connects the importation to marketing and sales, and none connects it to recruiting clinical investigators. Meril tries to recast an overtly promotional email blast as merely "inform[ing] potential clinical trial investigators that it would offer 'hands-on and [virtual reality] VR sessions'." Meril Brief at 46 (citing Appx892). But the email blast never mentions clinical investigators or clinical trials and was not limited to physicians who were being considered as clinical investigators. Rather, Meril admits that the advertised sessions with the Myval Devices were one of the things "the marketing group wants to kind of showcase at the TCT." Appx670. The email blast advertises prominently that Myval is "CE APPROVED" for sale in Europe. Appx746-748; Appx890-893. Meril had the email blast sent indiscriminately by the conference organizers to thousands of TCT attendees. Appx620. In contrast, when Meril wanted to communicate with potential clinical trial investigators, it did so directly

and without the sales-speak included in the email blast. Appx961; Appx774-783. Notably, Meril's investigator communications never mention sample Myval Devices, thus supporting the inference that the importation was not to recruit clinical investigators.

Meril's Brief also mischaracterizes this Court's relevant holding in *Amgen II*, arguing that *Amgen II* confirms that "underlying purposes do not matter." Meril Brief at 48. Meril is incorrect. In that case, the defendant Hospira objected to a jury instruction providing that "If Hospira has proved that the manufacture of a particular batch was reasonably related to developing and submitting information to the FDA in order to obtain FDA approval, Hospira's <u>additional</u> underlying purposes for the manufacture and use of that batch do not remove that batch from the Safe Harbor defense." 944 F.3d at 1338 (emphasis added). Hospira argued that the final sentence of the instructions improperly focused on Hospira's intent for manufacturing the batches. *Id.* This Court rejected that argument and found that Hospira's purpose to use certain batches as commercial inventory, which it later changed to inventory for continued process verification (CPV), "was probative of whether Hospira's use of Amgen's patented process was reasonably related to seeking FDA approval." *Id.* at 1340. This Court upheld the <u>jury's</u> determination, based in part on that evidence of Hospira's commercial purpose, that the manufacturing of these batches was not exempt under Section 271(e)(1). *Telectronics* is consistent with *Amgen II*, that the purpose of the alleged

infringement is at least relevant to the safe harbor inquiry. *Telectronics*, 982 F.2d at 1523 ("Absent some showing that Ventritex's purpose is disputed … such demonstrations constitute an exempt use … ."

While *Abtox* reached a different result, that is because there was evidence of an actual use that was reasonably related to obtaining FDA approval. *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1027 (Fed. Cir. 1997) (accused infringer conducted limited tests to obtain data necessary for filing an application with the FDA). In holding that these uses invoked the safe harbor, this Court was careful to qualify in its holding—twice—that the statute does not look to underlying purposes "as long as the use is reasonably related to FDA approval." *Id.* at 1030 (also stating "As long as the activity is reasonably related to obtaining FDA approval, [the accused infringer's] intent or alternative uses are irrelevant to its qualification to invoke the section 271(e)(1) shield.") Here, there was no use of the Myval Devices at all, not to mention any use related to FDA approval, so the holding of *Abtox* does not apply.

And while this Court in *Momenta II*, noted the breadth of the safe harbor exemption, citing *Abtox*, it concluded that the accused infringer's commercial production was not exempt even though the infringer performed routine testing as required by FDA regulations. *Momenta Pharms., Inc. v. Teva Pharms. USA, Inc.*, 809 F.3d 610, 620-21 (Fed. Cir. 2015). The *Momenta II* Court also limited the application of the 271(e)(1) exemption to uses to obtain FDA approval, and not to

all FDA-related uses. *Id.* at 621 (citing *Merck*, *Eli Lilly, Classen, Abtox,* and the legislative history). Here, there is substantial evidence supporting the inference that the Landmark Trial was not reasonably related to obtaining FDA approval because, among other things, it was a European post-approval study, and Meril was and is nowhere close to obtaining an IDE to perform the U.S. clinical trials that it has always known would be required for FDA approval.

Taken as a whole, this Court's authority holds that, if there is undisputed evidence of an actual use reasonably related to obtaining FDA approval, collateral commercial purposes for the otherwise infringing activity do not abrogate the exemption. But at least in the absence of an exempt post-importation use, Meril's demonstrably commercial purpose for its importation of the Myval Devices is at least relevant to the safe harbor inquiry, and precludes summary judgment.

## CONCLUSION AND RELIEF SOUGHT

Edwards respectfully submits that the Court should reverse the Judgment and the district court's Order granting summary judgment and direct the district court that Meril's safe harbor defense should be decided at trial.

DATED: January 17, 2023

By: */s/ Christy G. Lea*
Christy G. Lea

Steven M. Hanle, *Principal Attorney*
**STRADLING YOCCA CARLSON & RAUTH PC**

Christy G. Lea
**KNOBBE, MARTENS, OLSON & BEAR, LLP**

Carlo Van den Bosch
Gazal Pour-Moezzi
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**

*Attorneys for Plaintiffs-Appellants*
*Edwards Lifesciences Corporation and*
*Edwards Lifesciences LLC*

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on October 18, 2022, the foregoing **REPLY BRIEF OF APPELANTS EDWARDS LIFESCIENCES CORPORATION AND EDWARDS LIFESCIENCES LLC** was filed using the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

DATED: January 17, 2023

By: */s/ Christy G. Lea*
Christy G. Lea

*Attorney for Plaintiffs-Appellants*
*Edwards Lifesciences Corporation and*
*Edwards Lifesciences LLC*

**CERTIFICATE OF COMPLIANCE
UNDER FEDERAL RULES OF APPELLATE PROCEDURE
32(a)(7) AND FEDERAL CIRCUIT RULE 32**

Counsel for Appellants Edwards Lifesciences Corporation and Edwards Lifesciences LLC certifies that the brief contained herein has a proportionally spaced 14-point typeface and contains 6,968 words, based on the "Word Count" feature of Word version Office365, including footnotes and endnotes. Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), this word count does not include the words contained in the Certificate of Interest, Table of Contents, Table of Authorities, Abbreviations, and Statement of Related Cases.

DATED: January 17, 2023

By: */s/ Christy G. Lea*
Christy G. Lea

*Attorney for Plaintiffs-Appellants
Edwards Lifesciences Corporation and
Edwards Lifesciences LLC*

56590878